**ARGO DATA RESOURCE CORPORATION and Max Martin, Appellants**

v.

**Balkrishna SHAGRITHAYA, Individually and Derivatively in the Name of Argo Data Resource Corporation, Appellee.**

No. 05–10–00690–CV.

Court of Appeals of Texas, Dallas.

Aug. 29, 2012.

Rehearing Overruled Oct. 30, 2012.

Karen Sue Precella, Nina Cortell, David H. Harper, Haynes & Boone, LLP, Lyn-don F. Bittle, Tim Gavin, Kelli Michelle Hinson, Timothy Patrick Chastain, Carrington, Coleman, Sloman & Blumenthal, L.L.P., Dallas, TX, G. Parker Young, Haynes & Boone, LLP, Fort Worth, TX, for Appellants.

Leonard A. Hirsch, Mary Ann Joerres, Jason Fulton and Andrew B. Ryan, Diamond McCarthy, LLP, David S. Coale, Lynn Tillotson Pinker & Cox, LLP, Casey P. Kaplan, K & L Gates LLP, Christopher D. Kratovil, Dykema Gossett PLLC, Dallas, TX, for Appellee.

Before Justices MORRIS, FILLMORE, and MYERS.

## OPINION

Opinion By Justice MORRIS.

In this case we address a claim of minority shareholder oppression. Balkrishna Shagrithaya, the sole minority shareholder of ARGO Data Resource Corporation, brought this suit individually and on behalf of ARGO against both ARGO and Max Martin, the sole majority shareholder. Following a jury trial, the trial court signed a judgment in favor of Shagrithaya ordering Martin to cause ARGO to issue a one-time $85 million dividend as equitable relief for Martin's alleged oppressive conduct. The judgment further awarded Shagrithaya damages for breach of contract and attorney's fees. Finally, the judgment awarded ARGO damages and equitable relief based on three acts found by the jury to constitute a breach of fiduciary duty by Martin. Concluding that Shagrithaya failed to show his entitlement to relief on any of his individual or derivative claims, we reverse the trial court's judgment in its entirety and render judgment in favor of Martin and ARGO.

## I.

Although the parties have very different points of view on the matters forming the basis of this suit, the essential facts are clear. Max Martin and Balkrishna Shagrithaya met and became friends while working at Electronic Data Systems in Wisconsin. Shagrithaya eventually left EDS to work in the technology group at an accounting firm. In 1980, Martin approached Shagrithaya about starting a software business together. Shagrithaya agreed to join the venture, and the men co-founded ARGO Data Resource Corporation.

ARGO was formed as a closely held corporation with $1000 in capital. Martin contributed $530 of the capital and became a 53% shareholder in the company while Shagrithaya contributed $470, making him a 47% shareholder. Martin and Shagrithaya became the only two members of ARGO's board of directors, and each had an equal vote. Shagrithaya acknowledged, however, that Martin wanted to be the majority shareholder of ARGO so that if there was ever a disagreement between the two men when making a board decision, Martin would be able to break the tie. It was established that, in the event of a stalemate, Martin, as the majority shareholder, had the power to appoint a third director who would cast the tie-breaking vote. Shagrithaya agreed to this arrangement.

ARGO's business was to provide software and related services to the retail financial services industry. Shagrithaya was in charge of developing the technology, and Martin ran the business side. As the only shareholders, Martin and Shagrithaya elected themselves to serve as ARGO's directors each year and, as directors, they appointed themselves as the company's officers with Martin serving as president and treasurer and Shagrithaya serving as vice-president and secretary. Neither man had a written or oral agreement for employment or compensation. Instead, they decided on a year-to-year basis how much compensation they would receive. Shagrithaya testified that it was his understanding that, as co-founders, both he and Martin would receive an equal salary. And for the first twenty-five years that the men ran the company, they did, in fact, receive virtually equal compensation.

Initially, neither Martin nor Shagrithaya received any salary as they worked to build up ARGO's business and make it profitable. In addition, neither man received any dividends as shareholders. Shagrithaya explained that their plan was to invest all of their earnings in the company and not issue dividends with the goal of growing the business and eventually selling it. Both men agreed not to issue dividends for more than twenty years until 2004 when the company issued its first dividend of $160,000. ARGO grew from its initial capital of $1000 in 1980 to $152 million in 2008 based largely on the success of the products developed by Shagrithaya. Martin's and Shagrithaya's compensation also grew until each was receiving nearly $1 million a year. Each man placed a portion of that compensation in a debenture account with the company. The debenture account was used to pay personal expenses, including retirement contributions.

In the late 1990s and early 2000s, discussions began about Martin's and Shagrithaya's roles at ARGO. ARGO's customers questioned the plans for the company after Martin and Shagrithaya retired, and Martin testified that, due to their advancing age, health issues, and other factors, it was important for the company to have a succession plan in place. Martin moved to the role of chief executive officer and promoted an employee named David Engebos

to chief operations officer and, eventually, president of ARGO. Another employee, David Perkowski, was named as Shagrithaya's successor and Shagrithaya became chief technology officer. Although Shagrithaya never objected to the succession plans, he later stated that he did not like the way they were handled because the plans were not decided on by him and Martin as directors.

During this time, Martin began expressing displeasure with Shagrithaya's apparent unwillingness to take on more responsibility for the management of ARGO at an executive level. Beginning in early 2000, Martin began meeting with Shagrithaya in an effort to convince him to give up his responsibility for creating the products for the company and to expand his managerial role. In e-mails sent to Shagrithaya, Engebos, and Perkowski in 2003, Martin stated that one of his goals was to get the company to the point that it did not rely on the day-to-day participation of the founders and he was frustrated with Shagrithaya's unwillingness to move into a more supervisory role. Shargrithaya told Martin, however, that he wished to remain in product development and he was not interested in taking on a management role. He believed that, as the architect of the technologies upon which ARGO was built, it would not be easy for him to pass on his vision to someone else.

In 2006, Martin met with Shagrithaya and told him he could not justify paying him $1 million a year. Martin believed the work Shagrithaya was doing did not entitle him to executive compensation. Shagrithaya disagreed, arguing that his work in developing the technology marketed by the company was equally important. Shortly after the meeting, Martin unilaterally cut Shagrithaya's compensation to $300,000 for that year.

When Shagrithaya learned that his compensation had been cut, he met again with Martin and told him that he would be willing to "step down" from his position at ARGO. Martin's understanding was that Shagrithaya was offering to leave ARGO completely, including selling his shares in the company. Martin responded that he would contact potential buyers. Shagrithaya testified that it was not his intent at that time to sell his stock. He stated, however, that he did nothing to disabuse Martin of the idea that he wanted to be bought out. Shagrithaya testified that he was okay with the idea of selling his shares as long as he received fair value for them.

After investigating the potential for selling Shagrithaya's shares to a third party and talking with ARGO's legal counsel, Tom Harris, Martin told Shagrithaya that he believed the best option was to have ARGO buy out Shagrithaya. Martin also suggested that Shagrithaya retain independent counsel to represent him in the transaction. Shagrithaya hired an attorney, Greg Hidalgo, and in October 2006 sent Hidalgo an e-mail stating that he wanted to set up a meeting with Martin and Harris to discuss the sale of his shares. In the e-mail, Shagrithaya stated that he wanted a sale of all of his shares and he preferred to complete the deal by the end of the year. Shagrithaya also stated that there needed to be an independent valuation of the shares and that "there should not be any discount." Shagrithaya testified that he understood at the time that the company would use its retained earnings to purchase his shares and that was fine with him.

On November 7, 2006, Hidalgo sent Harris an e-mail listing three independent appraisers in order of preference. The e-mail also stated that Hidalgo expected the appraisal to be conducted without any minority discount so "that our clients can

then negotiate a fair purchase price." Martin agreed to use Business Valuation Advisors, LLC, the appraiser that Hidalgo indicated was Shagrithaya's first choice.

That same month, ARGO moved to new corporate offices. Although Martin and Engebos were placed in large offices in the executive suite, Shagrithaya was placed in a smaller office on a different floor. Additionally, new business cards were ordered, and Shagrithaya's were printed without any job title.

When no progress was made on Shagrithaya's buyout by the end of November, he proposed alternative solutions. Shagrithaya offered to accept either a partial buyout or to move into a consulting position with the company and receive a $50 million cash dividend. No action was taken on these proposals but, on March 5, 2007, both Martin and Shagrithaya authorized the issuance of a $250,000 dividend payable to them in proportion to their ownership.

During this same time period, the Internal Revenue Service performed an audit of ARGO for the 2005 tax year. As a result of the audit, the IRS issued ARGO a "Report of Income Tax Examination Changes" contending that ARGO was liable for an accumulated earnings tax for the tax year ending June 30, 2005. According to the IRS, ARGO had unreasonably accumulated earnings and profits in the amount of $7,948,180 and would therefore be assessed an accumulated earnings tax of $1,192,227.

In response, ARGO filed a formal protest with the IRS arguing that it did not accumulate earnings and profits beyond the reasonable needs of its business. The business needs specified in the protest included the necessity of working capital for the acquisition of competitors, expansion into the northern European market, and the relocation of its offices. In addition, the protest stated that the redemption of Shagrithaya's shares was a business ex-pense that was anticipated in 2005. The protest letter stated that "[ARGO's] executive management had concluded prior to June 30, 2005, that Mr. Shagrithaya's minority stock position would likely have to be redeemed to protect the stability of [ARGO's] business and to avoid impending management and shareholder conflicts that [ARGO's] executive management believed were almost certain to occur." The letter further stated that "[t]he implementation of the phase-out of Mr. Shagrithaya began in earnest in 2003 with a restructuring of [ARGO's] operational structure." Shagrithaya had no knowledge of the audit or the contents of the protest until several months after the protest was filed. Ultimately, the IRS agreed that ARGO was not retaining excessive earnings even without including a buyout of Shagrithaya's shares as a business expense and it withdrew its assessment of an accumulated earnings tax.

On April 10, 2007, Martin informed Shagrithaya of the results of the valuation prepared by Business Valuation Advisors. According to BVA, the total value of ARGO was $216 million. BVA then applied a 35% minority discount to Shagrithaya's shares and valued them at $66 million. Martin agreed to have ARGO purchase Shagrithaya's shares for this amount and prepared a board resolution authorizing the purchase. Shagrithaya acknowledged that a fair market value calculation of a minority shareholder interest generally included a discount to reflect the minority status. However, because the sale being discussed was not to a third party that would hold a minority interest but was instead to ARGO, Shagrithaya believed that the discount should not apply. Shagrithaya refused either to meet with BVA or approve the sale. Shortly after receiving the valuation, Shagrithaya

retained new counsel, Tony Curto, to represent him.

On May 9, Curto sent Martin a letter stating that Shagrithaya would be obtaining his own appraisal of his shares. In addition, Curto demanded that ARGO pay Shagrithaya a lump sum amount of supplemental compensation necessary to bring the amount in line with what Martin had been paid to date. Finally, Curto demanded that there be no further "discrepancies" between Shagrithaya's and Martin's compensation.

On July 2, before another appraisal was conducted, Shagrithaya proposed a special shareholders meeting with Martin. The stated purposes of the meeting included passing a resolution directing the board to retain an investment banker to advise them on the potential sale of ARGO and to declare an $85 million dividend. Shagrithaya testified that he proposed the $85 million dividend based upon information from his financial advisor after reviewing the BVA valuation. Neither proposal was acted upon.

On July 16, 2007, and again in October 2007, Wachovia Securities sent Martin a proposal to represent ARGO in a potential transaction with a third-party buyer. Wachovia offered to seek a new investor who would ultimately become the majority shareholder in the company. The plan also involved a redemption of Shagrithaya's shares. The proposal concluded that "conditions [were] optimal" for pursuing such a plan. Martin was not interested. He never informed Shagrithaya of Wachovia's proposal.

In August 2007, Curto submitted a list of three different appraisers Shagrithaya would be willing to have perform the second valuation of the company. Martin approved the first firm on the list. Shagrithaya testified that he later discovered that Martin had contacted the three firms to discuss the issue of minority valuation and discounts. Because of those discussions, Shagrithaya declined to use any of the proposed firms and did not further pursue another valuation.

The next month, Martin presented Shagrithaya with five alternatives to resolve the issue of his position and ownership interest in ARGO. The first alternative involved Shagrithaya retaining his shares and he and Martin selling the company together at some time in the future without a minority discount or majority premium accruing to either of them. Martin also stated that he was willing to discuss increasing Shagrithaya's compensation as part of an agreement that would address future job responsibilities, performance evaluations, and compensation levels.

The other four alternatives involved either issuing a substantial dividend, a partial or complete repurchase of Shagrithaya's shares, or the sale of Shagrithaya's interest to a third party. In discussing a complete repurchase of Shagrithaya's shares, Martin restated his position that a minority discount would apply to the purchase price. Martin also stated that if Shagrithaya desired to sell his interest to a third party, he reserved the right to protect his interests as a majority shareholder if the new shareholder took Shagrithaya's place. Shagrithaya rejected all of the alternatives believing they all benefitted Martin more than they benefitted him.

In early November 2007, Martin's counsel received a letter stating that Shagrithaya wished to change his approach to resolving the dispute and no longer wanted to discuss a buyout of his stock. Instead, Shagrithaya wanted the board to resolve to restore his salary to its previous level both retroactively and in the future, provide him and his accountant with full ac-

cess to ARGO's books and records, issue an $85 million dividend, and retain an investment banker to advise on the possibility of selling ARGO. Martin gave Shagrithaya full access to ARGO's books and records and Shagrithaya had his accountant perform an audit.

As a result of the audit, several matters in the use of corporate funds were noted. Among these was Martin's purchase of a Colorado condominium from ARGO without board approval, payments to Martin's wife in an amount equal to the lease payments on the Martins' company car, and payments for travel and other personal expenses that had been charged to ARGO's general fund rather than Martin's debenture account. Martin had ARGO conduct its own audit and, after reviewing the charges, Martin reimbursed ARGO in an amount greater than Shagrithaya's auditor stated was owed.

On December 28, 2007, Shagrithaya filed this suit naming Martin as the sole defendant and asserting claims for "oppressive conduct," breach of fiduciary duty, breach of contract, an accounting, and quantum meruit. Shagrithaya later amended his petition to name ARGO as a defendant and to assert derivative claims on behalf of ARGO for Martin's alleged misuse of corporate funds. In his final petition, Shagrithaya asserted causes of action for breach of fiduciary duty, fraud, malicious suppression of dividends, minority shareholder oppression, breach of contract, and defamation. The breach of fiduciary duty, fraud, and malicious suppression of dividend claims were asserted both individually and derivatively.

One year later, on December 30, 2008, the final board meeting attended by both Shagrithaya and Martin was held. For the first time, Martin appointed a third director to the board, Engebos, based on a previous board meeting that had resulted in a stalemate. Bill Hicks, ARGO's controller, and Harris, ARGO's counsel, were also present at the December meeting. The main issues addressed were the election of ARGO's officers, setting officer compensation, and the issuance of a dividend.

Both Martin and Shagrithaya proposed a list of executive officers to be elected. Martin proposed himself as chief executive officer, chairman of the board, and treasurer. Martin also proposed Engebos as president and Shagrithaya as secretary. Although Engebos had been serving as ARGO's president for several years, this was the first time the board addressed whether to formally elect him to that position. Shagrithaya proposed Martin as chief executive officer, president, and treasurer, Engebos as executive vice president and chief operating officer, and himself as executive vice president, chief technology officer, and secretary. Martin and Engebos voted in favor of Martin's proposed slate of officers. Shagrithaya did not.

The board then considered the issue of executive compensation. ARGO had engaged a company called Compensia to do a market analysis of executive compensation and to give a recommendation on the appropriate compensation levels for a chief executive officer, a president and chief operations officer, and a chief technical officer. Based on that report, Hicks stated that ARGO's management was proposing that Martin, as CEO, receive an annual salary of $350,000 with a bonus of $640,000 for the 2008 fiscal year. Shagrithaya's proposed salary as CTO was $220,000 with a bonus of $212,000. Shagrithaya would also receive back pay for fiscal years 2006 and 2007. Engebos, as president, would receive a salary of $260,000 with a bonus of $200,000.

Shagrithaya presented an alternate proposal that both his and Martin's salaries be

set at $1 million for the fiscal years 2008 and 2009 and that each receive back pay to the extent that they received less than $1 million in compensation for the fiscal years 2006 through 2009. Shagrithaya stated that the sole basis of his compensation proposal was his and Martin's past practices in setting compensation. Shagrithaya also proposed that Engebos receive a base salary of $460,000 for 2008 and 2009 based on Compensia's report. Martin and Engebos voted in favor of the management's proposal. It passed by a two-to-one vote.

Finally, the board addressed the issue of a dividend. Shagrithaya proposed issuing a one-time $85 million dividend to be divided proportionately between him and Martin. The stated basis for this proposal was his concern over the issues raised by the IRS relating to ARGO's retained earnings. Martin and Engebos responded that, given the current economic conditions, they could support the issuance of only a $25 million dividend. Martin and Engebos voted in favor of the $25 million dividend; Shagrithaya voted against it stating that he felt it was inadequate. Immediately after the board meeting, Shagrithaya resigned from the company.

The jury trial on Shagrithaya's claims began on September 8, 2009, and lasted approximately six weeks. Shagrithaya contended that the evidence showed that Martin had engaged in a secret scheme to oust him as a minority shareholder by slashing his salary and wrongfully retaining ARGO's earnings to buy him out. Shagrithaya relied heavily on the IRS protest filed by ARGO as proof that Martin was planning to force a buyout of his minority interest as early as 2003, long before he and Martin began discussing the possibility of Shagrithaya leaving the company. In addition, Shagrithaya pointed to various acts of alleged self-dealing by Martin to show that Martin had violated his fiduciary duties to the company. Martin and ARGO responded that none of the acts about which Shagrithaya complained caused him any injury as a shareholder and, absent an employment contract, Shagrithaya had no right to expect a continued level of employment or compensation equal to Martin's. They further contended that none of the alleged breaches of Martin's fiduciary duty harmed ARGO or resulted in an improper benefit to Martin.

After hearing the evidence, the jury found in favor of Shagrithaya on all claims submitted.[1] As damages for Shagrithaya's claims for shareholder oppression, malicious suppression of dividends, and fraud, the jury found that ARGO should issue a $65 million dividend. The jury also found that Shagrithaya was owed $2,094,000 in back compensation based on breach of an implied contract and awarded attorney's fees related to that claim. On Shagrithaya's derivative claims, the jury found that Martin should reimburse ARGO for various attorney's fees that were incurred due to Martin's failure to comply with his fiduciary duties to ARGO.

On March 31, 2010, the trial court signed its final judgment concluding that, based on the jury's findings, Martin had engaged in conduct that was oppressive to Shagrithaya's rights as minority shareholder. The court further concluded that the most appropriate equitable remedy was to compel Martin to "take all actions

---

1. The jury charge instructed the jury to make findings on Shagrithaya's individual claims for shareholder oppression, malicious suppression of dividends, implied contract and fraud as well as his derivative claim for breach of fiduciary duty to ARGO. Their remaining claims asserted in Shagrithaya's petition either were not submitted to the jury or were withdrawn.

properly and legally required" to cause ARGO to issue a dividend. In contrast to the jury's verdict, however, the court ordered a dividend in the amount of $85 million rather than $65 million. When later requested to set forth the legal bases supporting this equitable relief, the court stated that "a dividend of this large magnitude was warranted not as any kind of punitive measure, but solely in an effort to equitably respond to Martin's wrongful and fraudulent conduct in withholding of dividends with the intent of harming the minority shareholder." The judgment also awarded Shagrithaya damages of $1,361,100 based on his contract claim, attorney's fees, and pre-judgment and post-judgment interest on both the damages and equitable relief.[2]

On the derivative claims, the judgment awarded ARGO the amounts found by the jury as damages for Martin's breach of fiduciary duty. In addition, despite the fact that the jury concluded the condominium purchase caused ARGO no damages, the trial court ordered Martin to reverse the sale and return the property to ARGO. Shagrithaya was awarded attorney's fees and expenses for representing ARGO's interests derivatively. Both Martin and ARGO brought this appeal challenging the jury's verdict and the trial court's judgment.

## II.

The central issue in this appeal is whether Shagrithaya was subjected to and injured by minority shareholder oppression. Martin and ARGO challenge the oppression finding on several grounds including the legal and factual sufficiency of the evidence to support the jury's findings of fact and that the facts found by the jury do not support a finding of oppression as a matter of law. A challenge to the legal sufficiency of the evidence will be sustained if there is no evidence offered to establish a vital fact or the evidence does not exceed a scintilla. *See Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex.2006). Evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex.2004). When examining the legal sufficiency of the evidence, we must credit the favorable evidence if a reasonable juror could and disregard the contrary evidence unless a reasonable juror could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). When evaluating the factual sufficiency of the evidence, we consider all of the evidence and will set aside the verdict only if the evidence supporting the jury finding is so weak or so against the overwhelming weight of the evidence that the finding is clearly wrong and unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

■ It is within the province of the jury as factfinders to determine whether certain acts occurred. But the determination of whether such acts constitute shareholder oppression is a question of law for the court. *See Ritchie v. Rupe*, 339 S.W.3d 275, 285 (Tex.App.-Dallas 2011, pet. filed). We review questions of law de novo. *Id.* We are not obligated to give deference to the trial court's legal conclusions and, as the arbiter of the law, we have the duty to evaluate those conclusions independently. *See Pegasus Energy Grp., Inc. v. Cheyenne Petroleum Co.*, 3 S.W.3d 112, 121 (Tex.App.-Corpus Christi 1999, pet. denied).

**2.** The amount of contract damages found by the jury was reduced to account for income tax payments pursuant to section 18.091 of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem.Code Ann. § 18.091 (West 2008).

█ Courts must exercise caution in determining what actions constitute oppressive conduct. *See Willis v. Bydalek*, 997 S.W.2d 798, 801 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). A corporation's officers and directors are afforded broad latitude in conducting corporate affairs and the minority shareholder's expectations must be balanced against the corporation's need to exercise its business judgment and run its business efficiently. *See Gibney v. Culver*, No. 13–06–00112–CV, 2008 WL 1822767, at *17 (Tex.App.-Corpus Christi 2008, pet. denied) (mem. op.). Courts take a broader view, however, of what constitutes oppressive conduct in a closely held corporation where oppression may be found more easily. *Id.*

█ The cause of action for shareholder oppression was codified in 1955 by the Texas Legislature in article 7.05 of the Texas Business Corporation Act and it can now be found in section 11.404 of the Texas Business Organization Code. *See* Act of Mar. 30, 1955, 54th Leg., R.S., ch. 64, art. 7.05, 1955 Tex. Gen. Laws 239, 290–91, *amended by* Act of May 3, 1961, 57th Leg., R.S., ch. 169, 1, 1961 Tex. Gen. Laws, 319, 319, *expired Jan. 1, 2010*, Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 2, 2003 Tex. Gen. Laws 267, 595 (current version at Tex. Bus.Code Ann. §§ 11.402, .404 (West 2012)). The statute authorizes the court to fashion an equitable remedy if the actions of those in control of a corporation are illegal, oppressive, or fraudulent. *See id.; Rupe*, 339 S.W.3d at 289. Although the statute does not define the term "oppressive," Texas courts have recognized two non-exclusive definitions:

1. majority shareholder conduct that substantially defeats the minority's expectations that, objectively viewed, were both reasonable under the circumstances and central to the minority shareholder's decision to join the venture; or

2. burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company's affairs to the prejudice of some members; or a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

*See Rupe*, 339 S.W.3d at 289. Depending on the facts of the case, conduct found by the jury could be oppressive under either or both definitions. *Id.*

█ When examining whether a minority shareholder's reasonable expectations were substantially defeated, we distinguish between specific reasonable expectations and general reasonable expectations. *Id.* at 291. Specific expectations require proof of specific facts giving rise to the expectation in a particular case and a showing that the expectation was reasonable under the circumstances of the case as well as central to the minority shareholder's decision to join the venture. *Id.* Examples of possible specific reasonable expectations are employment in the corporation or a say in management. *Id.*

█ In contrast, general reasonable expectations are expectations that arise from the mere status of being a shareholder. *Id.* These expectations belong to all shareholders and, absent evidence to the contrary, are both reasonable and central to the decision to invest in the corporation. *Id.* Examples of general reasonable expectations are the right to proportionate participation in the earnings of the company, the right to any stock appreciation, the right (with proper purpose) to inspect corporate records, and the right to vote if the stock has voting rights. *Id.*

The jury charge in this case asked the jury to determine whether Martin had engaged in eleven separate acts that Shagri-

thaya contended supported his claim for shareholder oppression.[3] The jury answered "yes" to each of the enumerated acts. We examine each act in turn.

■ First, the jury concluded that Martin "reduc[ed] Shagrithaya's annual compensation at ARGO by 70 percent without the approval, if required, of ARGO's Board of Directors or ARGO's shareholders." This fact is largely undisputed and is supported by the evidence. An expectation of annual employment compensation cannot be said to be a general expectation held by all shareholders of a corporation. Accordingly, Shagrithaya was required to provide proof of specific facts showing that his specific expectation of a certain level of compensation was reasonable under the circumstances and central to his decision to join ARGO. *Id.*

■ At trial, Shagrithaya testified that he had no discussions with Martin about his compensation before they founded ARGO. He further testified that he had no written or oral agreement about his compensation. Neither Martin nor Shagrithaya received any compensation until after ARGO began to generate revenue. Each year after the founding of the company, Martin and Shagrithaya signed board resolutions setting their salary for the year. To the extent that Shagrithaya specifically expected to be paid an equivalent salary to Martin as they built the company together, and this expectation was central to his decision to join ARGO as a shareholder, his expectation was met

for the first twenty-five years that he worked at the company. To the extent Shagrithaya expected, however, to maintain a level of compensation equal to Martin's indefinitely regardless of circumstances or his position in the company, we conclude that, without an agreement pertaining to compensation, such an expectation was not reasonable. Texas law does not recognize a minority shareholder's right to continued employment without an employment contract. *See Willis,* 997 S.W.2d at 803. And, absent an employment contract, an expectation of continued employment at a certain level of compensation cannot be considered objectively reasonable. *See id.*[4]

■ We also conclude that the reduction in Shagrithaya's compensation level was not so burdensome, harsh, or wrongful that it constituted shareholder oppression. Although Martin's action in unilaterally reducing Shagrithaya's compensation without presenting the matter to the board for approval may have been wrongful in that it did not follow proper corporate procedure, the action directly related to Shagrithaya's position as an employee and not to his status as a shareholder. The absence of board approval was later corrected at the December 2008 board meeting. At that meeting, ARGO's controller presented the board with the findings of an executive compensation review prepared by Compensia, an independent consulting firm. After examining the compensation levels of executives at ARGO's peer companies, Compensia recommended a base salary for

---

3. The charge also asked the jury to determine whether each of the enumerated acts met either one or both of the definitions of shareholder oppression. As noted above, however, it is the duty of the court, not the jury, to determine whether the acts found by the jury constitute shareholder oppression. *See Rupe* at 289; *Davis v. Sheerin,* 754 S.W.2d 375, 381 (Tex.App.-Houston [1st Dist.] 1988, writ de-

nied). Accordingly, we do not consider the jury's findings on those issues.

4. We address the jury's finding of an "implied" compensation agreement below. Furthermore, as in *Willis,* we are not concluding that a reduction in compensation can never, under any circumstances, constitute shareholder oppression. *Id.* at 802.

Martin as CEO of $350,000 with a target bonus of between $850,000 to $1,000,000. Compensia further recommended a base salary for Shagrithaya as CTO of $220,000 with a target bonus of between $385,000 to $470,000. Shagrithaya contended at the meeting that both he and Martin should receive $1 million in compensation because they had always received equivalent salaries. The board ultimately voted two-to-one to set Martin's and Shagrithaya's base salaries at the level recommended by Compensia but reduced the bonus amounts to $640,000 and $212,000 respectively. These compensation levels were made retroactive to 2006, the first year that Shagrithaya's compensation was reduced, and Shagrithaya was paid all back compensation necessary to raise his salary from the level set by Martin to the level set by the board. Because the board's action was made retroactive to the date Shagrithaya's salary was originally reduced, Shagrithaya suffered no harm as a result of the absence of board approval in 2006.

While Shagrithaya disagreed with, and voted against, the compensation levels set by the board, the inability to control board decisions is inherent in the position of a minority shareholder. *See Patton v. Nicholas,* 154 Tex. 385, 393, 279 S.W.2d 848 (Tex.1955) (a finding of general domination and control of a board of directors by a majority shareholder does not alone show damage or extreme irregularity in corporate management). Both his and Martin's compensation levels were based on the same independent report and Shagrithaya made no showing that the report was either biased or based on factually inaccurate information. Although he presented expert testimony at trial that his work for ARGO was worth more than the amount of compensation the board approved for him, none of this evidence was presented to the board at the time his compensation was set. Even Shagrithaya's compensation expert testified that the amount of compensation that was appropriate for Shagrithaya was substantially lower than the amount of compensation that was appropriate for Martin. Absent any evidence that Shagrithaya was deprived of his rights as a shareholder, such as the right to vote his shares, Shagrithaya's dispute with Martin and ARGO over his level of compensation is purely an employment matter. Accordingly, we conclude the reduction in Shagrithaya's compensation did not prejudice Shagrithaya's rights as a shareholder and was not such a "visible departure from the standards of fair dealing" that it would support a finding of shareholder oppression.

 The next act found by the jury was "[m]aintaining Martin's annual compensation at $1 million, from July 1, 2005 to June 30, 2007, without the approval, if required, of ARGO's Board of Directors or ARGO's shareholders." Again, this act is largely undisputed and is supported by the evidence. As with the decrease in Shagrithaya's compensation, to the extent this act could be considered wrongful because it was committed by Martin unilaterally without board approval, the absence of board approval did not cause Shagrithaya any harm because the board's resolution on executive compensation was made retroactive to the date Martin first set his compensation unilaterally. Also, as discussed above, any specific expectation by Shagrithaya that he and Martin would maintain equal levels of compensation indefinitely was objectively unreasonable absent a contract. Accordingly, we must determine whether Martin's action defeated a general reasonable expectation of Shagrithaya as a shareholder.

 Although a shareholder has no general reasonable expectation about the compensation levels of the corporation's

executives, a shareholder does have a right to proportionate participation in the company's earnings. *See Rupe*, 339 S.W.3d at 292. Therefore, if a minority shareholder can show that another shareholder employed by the company is receiving compensation so far in excess of what is reasonable for his position and level of responsibility that he is, in actuality, receiving a de facto dividend to the exclusion of the minority shareholder, such an act may support a finding of minority shareholder oppression. *See Gibney*, 2008 WL 1822767, at *16. In this case, however, Shagrithaya presented no evidence that any portion of Martin's compensation amounted to a de facto dividend.

The amount that Martin was paid, both in salary and in bonus, was supported by the independent report presented at the December 2008 board meeting. In addition, Shagrithaya testified at trial that he never had an issue with the fact that Martin received $1 million a year in compensation. Finally, Shagrithaya's compensation expert testified that, based on his calculations, an appropriate level of compensation for Martin was approximately $2.5 million per year, substantially more than the amount of compensation that was approved by the board. Because there is no evidence Martin's compensation amounted to a de facto dividend or affected Shagrithaya's interests as a shareholder, we conclude the jury's finding that Martin continued to receive $1 million in compensation from July 1, 2005 to June 30, 2007 does not support a finding of minority shareholder oppression.

The third fact found by the jury was that Martin engaged in a plan "to retain ARGO's earnings to buy out Shagrithaya's interest in ARGO without disclosing this plan to Shagrithaya." This fact is closely tied to the fourth fact found by the jury: Martin caused ARGO to "retain earnings rather than paying a greater amount of dividends to its shareholders than it actually paid." Both of these fact findings further relate to the jury's findings on Shagrithaya's separately asserted cause of action for malicious suppression of dividends, that is, that Martin "dominat[ed] and controll[ed] the Board of Directors of ARGO with the actual result of suppressing the issuance of dividends to Shagrithaya … for the purpose of preventing Shagrithaya from sharing in the profits to be derived from the operation of ARGO … [and] depreciating the value of the shares of stock in ARGO owned by Shagrithaya to a lower value than his shares of stock would otherwise have." Shagrithaya argues that these findings show that Martin engaged in a scheme to stockpile ARGO's earnings for the secret purpose of buying him out for a heavily discounted amount, which he would be compelled to accept due to a lack of dividends. Martin and ARGO respond that many of the jury's findings are not supported by legally or factually sufficient evidence. They further argue that Shagrithaya's reasonable expectations as a shareholder were not substantially defeated and none of the actions found by the jury actually resulted in any harm to Shagrithaya's interests as a shareholder. We agree.

We first note that, although Shagrithaya asserted "malicious suppression of dividends" as a separate cause of action, this claim is merely a form of minority shareholder oppression and must be analyzed as such.[5] We begin, therefore, by

---

5. Shagrithaya relies on the case of *Patton v. Nicholas* to support his separate claim for malicious suppression of dividends. At the time *Patton* issued, however, the Texas Business Corporation Act and its provisions dealing with shareholder oppression were not yet in effect. *See Patton*, 279 S.W.2d at 854. Cases since then have recognized that the

determining whether the acts found by the jury are supported by sufficient evidence, and if so, whether they defeated Shagrithaya's reasonable expectations as a shareholder regarding the issuance of dividends.

Shagrithaya does not dispute that for the first two decades of ARGO's existence both he and Martin jointly agreed as ARGO's directors not to issue dividends. Shagrithaya contends only that, beginning at latest in 2003 and possibly as early as 2001, Martin began retaining ARGO's earnings for the purpose of buying out Shagrithaya's shares without telling him. It is essentially this scenario that the jury found to have occurred in its third and fourth findings of fact under Shagrithaya's shareholder oppression claim. After reviewing the evidence, we conclude there is more than a scintilla of evidence to support these findings and the findings are not against the great weight and preponderance of the evidence.

Whether the evidence is sufficient to support the jury's findings on the malicious suppression of dividends is less clear. In that portion of the charge, the jury concluded that Martin dominated and controlled the board with the result of suppressing the issuance of dividends to Shagrithaya. While the evidence supports this finding as far as it goes, the evidence also shows that, to the extent dividends were "suppressed" from being paid to Shagrithaya, they were also suppressed from being paid to Martin. Similarly, the jury found that Martin suppressed the issuance of dividends "for the purpose of preventing Shagrithaya from sharing in the profits to be derived from the operation of ARGO." The evidence shows, however, that dividends were issued in 2004, again in 2007, and that by the end of 2008, over $25 million in dividends had been issued. Martin and Shagrithaya participated in those distributions in proportion to their ownership of the company. Therefore, Shagrithaya was not entirely prevented from "sharing in the profits" of ARGO and the company's earnings were distributed to him to the same extent that they were to Martin.

■■■ Finally, the jury found that Martin suppressed the issuance of dividends "for the purpose of depreciating the value of the shares of stock in ARGO owned by Shagrithaya to a lower value than his shares of stock would otherwise have." Even assuming that the evidence supported the finding as to Martin's motivation, there is no evidence to support a finding that Martin's actions resulted in lowering the value of Shagrithaya's stock. The evidence shows that the value of the company and Shagrithaya's shares continued to grow throughout the time period that Shagrithaya claims Martin was suppressing dividends. Shagrithaya directs us to no evidence that the value of his shares was affected by Martin's actions.

Based on the foregoing, we conclude that the evidence supports the jury's findings that Martin caused ARGO to retain earnings rather than pay a greater amount of dividends. The evidence also supports the jury's finding that Martin retained earnings for the purpose of buying out Shagrithaya's shares without making Shagrithaya aware of this purpose. To the extent, however, that the jury's findings could be read as finding that Shagrithaya was individually targeted for the purpose of preventing him from sharing in the profits of the company or that the value of his shares was depreciated by Martin's

malicious suppression of dividends is a factual determination that may support a finding of shareholder oppression under the statutory cause of action rather than a separate common law claim. *See e.g. Davis,* 754 S.W.2d at 382.

actions, we conclude the evidence is legally insufficient to support such findings. Having determined which findings of fact were supported by the evidence, we now examine whether those facts support a finding of oppression.

First, we must determine whether Martin's decision to retain ARGO's earnings rather than issue more dividends than it did substantially defeated Shagrithaya's specific reasonable expectations as a shareholder. Shagrithaya testified at trial that his plan with Martin when they started ARGO was to build the company, in part, by retaining all of the company's earnings. They then planned to reap the return on their investment by selling the company. The evidence is clear, therefore, that Shagrithaya joined ARGO with no expectations of receiving dividends and Martin's conduct did not defeat Shagrithaya's specific expectations.

With respect to general expectations, a shareholder may generally expect to share proportionately in the company's earnings, but a shareholder has no general expectation of receiving a dividend. Texas law does not require a corporation to issue dividends. *See* Act of May 14, 1987, 70th Leg., R.S., ch. 93, art. 2.38–1, 1987 Tex. Gen. Laws 203, 213, *expired Jan. 1, 2010*, Act of May 13, 2003. 78th Leg., R.S., ch. 182, § 2, 2003 Tex. Gen. Laws 267, 595 (current version at TEX. BUS. ORGS.CODE ANN. § 21.302 (West 2012)). It is within the discretion of the board of directors whether a dividend will issue. *Id.* Therefore, a shareholder's general reasonable expectations are limited to sharing in the company's earnings through an appreciation in the value of his shares or receiving a proportional share of any divi-

dend the board of directors may choose to issue. In this case, although Shagrithaya may disagree with the reasons behind Martin's decision to have ARGO retain its earnings, he could have had no general reasonable expectation as a shareholder of receiving dividends.

In addition, the evidence shows that ARGO did, in fact, issue over $25 million in dividends during the time period that Shagrithaya claims Martin was wrongfully causing ARGO to retain its earnings.[6] It is undisputed that Shagrithaya received his 47% proportional share of those dividends. Because Shagrithaya participated proportionately in the earnings of the company by receiving over $11 million in dividends, we conclude his general reasonable expectations were not substantially defeated. *See Gibney*, 2008 WL 1822767, at *18 (no oppression where shareholder received proportionate share of dividends that issued).

Finally, we must determine whether the acts found by the jury, and supported by the evidence, constitute burdensome, harsh, or wrongful conduct. Shagrithaya focuses on the fact that Martin did not reveal to him that he was retaining ARGO's earnings in anticipation of buying out his minority interest in the company. Buying out a minority shareholder's interest is not an improper purpose for retaining a company's earnings. Such a purpose becomes improper only if it negatively impacts the minority shareholder's rights. As Shagrithaya notes in his brief, the two ways a minority shareholder's rights may be impacted are if he is prevented from sharing in the profits of the company or the sale value of his shares

---

**6.** After trial, but before the trial court rendered its judgment, ARGO issued another $5 million dividend and adopted a policy for issuing such dividends in the future. Because this evidence was not before the trier of fact, we focus only on the conduct occurring before trial to determine whether oppression occurred.

in the marketplace is depreciated. *See Patton*, 279 S.W.2d at 853. But, as shown above, neither of these things occurred.[7] Because Martin's "suppression of dividends" did not substantially defeat Shagrithaya's expectations or prejudice his rights as a shareholder, we conclude this conduct did not amount to minority shareholder oppression.

■ The next act found by the jury was that Martin failed to disclose to ARGO's board of directors that the IRS had assessed a retained earnings tax against ARGO of approximately $1.2 million. Because ARGO's board of directors at the time consisted of only Martin and Shagrithaya, the finding is that Martin failed to inform Shagrithaya of the assessment. The evidence presented at trial supports this finding, but Martin and ARGO contend Shagrithaya's interests were not harmed as a result. Again, we agree with Martin and ARGO.

Although the IRS assessed a $1.2 million retained earnings tax against ARGO, this assessment was challenged and ultimately reversed through a showing that the retained earnings were not excessive. Shagrithaya makes no argument and points to no evidence showing how his interests as a shareholder were affected by either the overturned assessment or the fact that he was unaware of the assessment. Absent evidence that Shagrithaya's interests as a shareholder were affected, we conclude the conduct cannot support a finding of shareholder oppression.

■ Next, the jury found that Martin made "an offer for ARGO to purchase Shagrithaya's shares in ARGO for $66 million." The evidence clearly supports the finding that this offer was made. Shagrithaya argues that the offer was oppressive because it was for a discounted amount that he would be forced to accept due to the absence of dividends. This argument is not well taken.

■ There are two ways to value a minority shareholder's stock: enterprise value and fair market value. *See Rupe*, 339 S.W.3d at 300. The enterprise value is determined by assessing the value of the company as a whole and ascribing to each share its pro rata portion of that overall value. *Id.* Enterprise value does not include a discount based on the stock's minority status or lack of marketability. *Id.* The fair market value of stock is the price at which the stock would change hands between a willing seller, under no compulsion to sell, and a willing buyer, under no compulsion to buy, with both parties having reasonable knowledge of the relevant facts. *Id.* Fair market value of minority shares includes a minority discount. *Id.* Courts have ordered majority shareholders to buy out a minority shareholder's interest using enterprise value where the minority shareholder was forced to relinquish his ownership position in the company by the majority's oppressive conduct and, absent threat of dissolution or other judicial sanction, the majority was an unwilling buyer. *Id.* at 301. Where these facts are not present, fair market value is the appropriate valuation of the minority interest. *Id.*

Here, Shagrithaya was not forced to relinquish his ownership position in the company as is shown by the fact that he continues to be a 47% owner of ARGO. He actively demonstrated interest in having his shares bought by ARGO, and Martin demonstrated willingness to have ARGO purchase the shares. Accordingly, the appropriate valuation of Shagrithaya's shares

---

**7.** With respect to the fact that Martin kept the purpose for retaining earnings a secret from Shagrithaya, we address that in connection with Shagrithaya's fraud claim below.

for purposes of a buyout in this case would be a fair market valuation. *Id.* The $66 million offer made by Martin was based on a fair market valuation prepared by an independent appraiser chosen by Shagrithaya. Shagrithaya does not point to any evidence that the valuation was biased or inaccurate. Nor was the jury asked what an appropriate valuation of Shagrithaya's shares would be.

Furthermore, the mere offer to purchase the shares for fair market value cannot amount to oppression. Although Shagrithaya argues that he would be forced to accept the discounted offer because of the lack of dividends, the evidence shows, and he conceded at trial, that he was under no financial pressure to accept the offer and, in fact, he did not accept it. The evidence does not show, and the jury did not find, that Martin refused to consider having ARGO purchase Shagrithaya's shares at any other price. Instead, the evidence shows that Shagrithaya made no counter-offer and had no other valuations prepared. Accordingly, we conclude the jury's finding that Martin made a $66 million fair market value offer for Shagrithaya's shares does not support a finding of shareholder oppression.

 The next finding by the jury was that Martin required Shagrithaya "to report to David Engebos after Martin appointed Engebos as President of ARGO without obtaining the approval of ARGO's Board of Directors." This conduct, even if supported by the evidence, does not relate to Shagrithaya's rights or expectations as a shareholder. To whom Shagrithaya is required to report as an employee of ARGO is an employment matter. As for Engebos's appointment as president of ARGO without the approval of the board of directors, Shagrithaya did not protest this act as a board member at the time it occurred and the appointment was later approved by the board at the December 2008 board meeting. Absent any evidence of harm to Shagrithaya's interests as a shareholder, we conclude the act does not rise to the level of shareholder oppression.

 The next three acts found by the jury all relate to Martin's alleged misuse of ARGO's corporate assets. The jury found that Martin: (1) acquired a Colorado condominium from ARGO without disclosing the sale to, or obtaining the approval of, ARGO's board of directors; (2) used ARGO's funds to pay personal travel expenses or other personal and family expenses; and (3) maintained his wife on ARGO's payroll while she was performing no services for ARGO. Even in the case of a closely held corporation, shareholders generally have no independent cause of action and cannot recover personally for misappropriation of corporate assets. *See Wingate v. Hajdik,* 795 S.W.2d 717, 719 (Tex.1990). Even if we considered the acts found by the jury to show that Martin was receiving a disproportionate amount of ARGO's earnings through the use of corporate assets for personal matters, the evidence shows that, once the audit was completed, Martin repaid ARGO more than the amount Shagrithaya claimed was owed based on these acts. Any harm to Shagrithaya was, therefore, remedied before trial. Based on the record before us, we conclude that there is no evidence that Shagrithaya's expectations or rights as a shareholder were harmed by these acts.

 Finally, the jury found that Martin failed to disclose to ARGO's board of directors that he had retained a law firm to challenge the IRS tax assessment against ARGO. It is unclear on what basis Shagrithaya contends this act was oppressive. ARGO as a whole benefitted from the representation through the successful challenge, and there was no showing that Martin obtained any personal benefit that

was denied to Shagrithaya. Accordingly, we cannot conclude this act defeated Shagrithaya's expectations as a shareholder or was in any way wrongful. Based on the foregoing, we conclude that none of the eleven acts the jury found in support of Shagrithaya's shareholder oppression claim, nor any of the acts found in support of Shagrithaya's claim for malicious suppression of dividends, show minority shareholder oppression.

■ The $85 million dividend awarded by the trial court was based on not only Shagrithaya's claim for shareholder oppression and suppression of dividends, but also on Shagrithaya's claim for fraud. The statute granting shareholders the right to pursue an equitable remedy for the wrongful conduct of the corporation's governing persons allows for a remedy if the actions of the governing persons are illegal, oppressive, or fraudulent. *See* TEX. BUS. ORGS.CODE ANN. § 11.402 (West 2012). A finding of fraud, however, requires a showing of actual injury. *See M.D. Anderson Cancer Ctr. v. Novak,* 52 S.W.3d 704, 707 (Tex.2001). Both Martin and ARGO contend there is no showing that Shagrithaya suffered any injury as a result of Martin's alleged fraud.

Shagrithaya based his fraud claim solely on Martin's failure to disclose his anticipation of buying out Shagrithaya's shares as the purpose for retaining ARGO's earnings from approximately 2001 to 2006. Even assuming this was a material fact that Martin had a duty to disclose, Shagrithaya points to no evidence of how he was harmed by the withholding of this information. Shagrithaya states that if he had known that Martin was retaining ARGO's earnings to buy him out rather than for the business purposes he thought the earnings were intended for, he would have "raise[d] the dividend issue with his co-founder." Shagrithaya argues that it "cannot be presumed" that Martin would have refused to declare a dividend in 2001 in the face of Shagrithaya's insistence. It equally cannot be presumed that Martin would have voted for a dividend. A shareholder has no right to dividends. *See* TEX. BUS.ORGS.CODE ANN. § 21.302. And the structure of ARGO's board of directors giving both members an equal vote meant that no dividend would issue unless Martin agreed. There is no evidence, therefore, that any additional dividends would have issued but for Martin's alleged fraud.

Shagrithaya further contends that if he had known of Martin's desire to "phase him out," he could have found a third-party buyer for his shares or sought a buyer for the entire company. There are several problems with this contention. First, as a form of injury, Shagrithaya's contention of what he might have done is entirely speculative. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 49–50 (Tex. 1998) (actual injury does not include lost profits on bargain never struck). Second, there is no showing that Shagrithaya's ability to sell his shares or their fair market value was negatively impacted by the five-year delay between when Martin began retaining earnings in anticipation of buying out Shagrithaya and when Shagrithaya knew about this fact. To the contrary, the evidence shows that the value of Shagrithaya's shares continued to grow during this time period. Finally, Shagrithaya had no right to force a sale of the entire company, which would necessarily include Martin's majority shareholder interest. Although Shagrithaya relies heavily on the Wachovia proposal stating that it was an "optimal" time to seek a buyer for ARGO, there is no evidence, and no jury finding, that but for Martin's wrongful actions, the company would have been sold.

Shagrithaya next argues that he could have "signaled his displeasure" with Martin to the market and to ARGO's stakeholders by resigning from ARGO and "perhaps, by starting his own competing venture." We fail to see how depriving Shagrithaya of the ability to express his displeasure constitutes an injury to him. And Shagrithaya's conjecture that he *might* have started his own competing business is, as with the sale of his shares, purely speculative. *See Swank v. Cunningham*, 258 S.W.3d 647, 667 (Tex.App.-Eastland 2008, pet. denied) (a party cannot recover damages that are based on speculation or conjecture).

Lastly, Shagrithaya contends that he was harmed by having the vast majority of his assets locked up in a single, undiversified investment. Shagrithaya chose to have his assets "locked up" in ARGO for the first twenty years he worked for the corporation and, as stated above, his shares continued to grow in value from 2001 to 2006, the period of time he contends he was defrauded. Shagrithaya makes no showing that he would have been better off financially if he had diversified his interests by selling his shares of ARGO during this time period. We conclude, therefore, that Shagrithaya provided no evidence that he was injured by Martin's alleged fraud. Without evidence of injury, the evidence is legally insufficient to support the jury's finding of fraud.

Having determined that the evidence does not support a finding of fraud or shareholder oppression, including malicious suppression of dividends, we conclude the trial court erred in ordering the equitable remedy of an $85 million dividend. We reverse that portion of the trial court's judgment and render judgment that Shagrithaya take nothing by these claims.

We next address Martin's and ARGO's challenges to the jury's verdict against them on Shagrithaya's claim for breach of an implied contract. The jury found that Shagrithaya entered into an implied agreement with Martin and ARGO that his annual compensation would be equal to Martin's while both he and Martin remained active in ARGO's business. Martin and ARGO contend the evidence is insufficient to show that a contract was formed and the alleged agreement fails for indefiniteness as a matter of law.

For a contract to be formed, the minds of the parties must meet with respect to the subject matter of the agreement and all its essential terms. *See Effel v. McGarry*, 339 S.W.3d 789, 792 (Tex. App.-Dallas 2011, pet. denied). The parties must assent to the same thing in the same sense at the same time. *Id.* Their assent must comprehend the whole proposition, and the agreement must comprise all of the terms that they intend to introduce into it. *Id.* Furthermore, the legal obligations and liability of the parties must be sufficiently definite. *See Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 793 (Tex.App.-Dallas 2007, no pet.). Whether an agreement fails for indefiniteness is a question of law for the court. *See Knowles v. Wright*, 288 S.W.3d 136, 143 (Tex.App.-Houston [1st Dist.] 2009, pet. denied). A lack of definiteness may concern the time of performance, the price to be paid, the work to be done, the service to be rendered, or the property to be transferred. *Id.* A contract must be definite because a party cannot accept an offer to form a contract unless the terms of that contract are reasonably certain and the court must be able to determine the legal obligations and liabilities of the parties. *Id.* Although Texas courts favor validating contracts, we may not create one where none exists. *See Lamajak*, 230 S.W.3d at 793.

In this case, Shagrithaya conceded at trial that he never had any discussions with Martin about compensation when they formed ARGO and he never made any oral or written agreements with Martin concerning the issue. The sole basis of Shagrithaya's contract claim is that, once he and Martin began receiving compensation from ARGO, they voted each year as board members to receive the same amount. The simple fact that a party has consistently done something in the past does not, standing alone, demonstrate an agreement to continue performing the same act in the future. In addition, Shagrithaya points to no evidence, and the jury made no findings, that the parties had any meeting of the minds over any other terms of Shagrithaya's employment, such as his specific job obligations or the duration of his employment. The agreement found by the jury was merely that Shagrithaya and Martin would receive equal compensation "while they both remained active in the business of ARGO." An agreement to "remain active" in the business is not sufficiently clear and definite to allow the court to determine the legal obligations of the parties. *See Knowles*, 288 S.W.3d at 142–43. We conclude, therefore, that Shagrithaya failed to present sufficient evidence of a legally enforceable agreement to support the jury's verdict in his favor for breach of contract. We reverse the trial court's judgment on this claim and render judgment in favor of Martin and ARGO.

■ The last claim submitted to the jury was Shagrithaya's derivative claim for breach of fiduciary duty to ARGO. The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship between the plaintiff and defendant; (2) a breach of the duty by the defendant; and (3) injury to the plaintiff or benefit to the defendant. *See Jones v. Blume*, 196 S.W.3d 440, 447 (Tex.App.-Dallas 2006,

pet. denied). Although Shagrithaya asked the jury to determine whether six different acts committed by Martin constituted a breach of fiduciary duty to the company, he only submitted damage questions on three of the alleged acts. Of those three acts, the jury awarded damages with respect to only two. The trial court, however, decided to award relief with respect to the third act despite the fact that the jury found no damages. Martin contends that the evidence is legally and factually insufficient to show that any of the acts alleged by Shagrithaya caused harm to ARGO or resulted in an improper or unfair benefit to Martin. Because the judgment awarded damages only in relation to three of the alleged acts, our review is limited to those three findings.

■ The first act upon which the jury awarded damages was Martin's decision to retain ARGO's earnings rather than issue a greater amount of dividends to the shareholders. Even assuming this act could be found to be a breach of Martin's fiduciary duty to ARGO; we fail to see how this act harmed ARGO or benefitted Martin. As Shagrithaya stated at trial, the retention and reinvestment of the company's earnings benefits the corporation. And the absence of dividends cannot be seen as a benefit to Martin as a shareholder.

The damages awarded by the jury attributable to the first act were the amount of legal fees that ARGO paid to challenge the retained earnings tax assessment. The theory, therefore, is that but for Martin's retention of the company's earnings, ARGO would not have had to pay attorneys to challenge the assessed tax. To avoid the assessment, ARGO would have had to distribute $7,948,180 of its earnings, the amount the IRS originally claimed ARGO had unreasonably accumulated. Instead, ARGO paid its attorneys approxi-

mately $46,000 to successfully challenge the assessed tax, resulting in a net benefit to ARGO of over $7,900,000. We conclude that there is no evidence to support a finding that ARGO was harmed or that Martin benefitted from the decision to retain ARGO's earnings.

■ The jury also awarded damages based on a finding that Martin used ARGO's funds to pay for legal services rendered solely for his benefit from October 2006 to December 2007. It was during this time period, before Shagrithaya filed suit, that he and Martin were negotiating ARGO's purchase of Shagrithaya's shares and the possible issuance of a dividend. Obviously these matters impacted ARGO's interests. Shagrithaya points to no evidence that the attorneys working on these matters represented Martin's interests rather than ARGO's or that the attorneys considered Martin's interests to the detriment of ARGO's. Because Shagrithaya failed to show that the legal services were rendered solely for Martin's benefit, we conclude the evidence does not support the jury's award.

■ The last alleged breach of fiduciary duty on which relief was granted was Martin's sale to himself of a Colorado condominium, originally owned by ARGO, without the approval of the board of directors. As noted above, the jury concluded that ARGO suffered no damages as a result of this act. The evidence unequivocally shows that ARGO benefitted from the sale of the condominium to Martin and that Martin paid a fair price for the property. Despite this evidence, the trial court's final judgment orders Martin to return the property to ARGO and orders ARGO to reimburse Martin the sum of $575,000. Shagrithaya did not request this relief on behalf of ARGO and neither the trial court nor Shagrithaya provides any legal justification for the award. Because the evidence does not support a finding of harm to ARGO or improper benefit to Martin and Shagrithaya did not request the equitable relief granted, we conclude the trial court erred in ordering the sale reversed. We reverse the trial court's judgment in favor of ARGO on Shagrithaya's derivative claim for breach of fiduciary duty and render judgment in favor of Martin.

Because of our resolution of the issues discussed above, it is unnecessary for us to address the remainder of Martin's and ARGO's arguments on appeal. We reverse the trial court's judgment in its entirety and render judgment that Shagrithaya take nothing by his claims.