**Opinion issued April 4, 2013**



In The

Court of Appeals

For The

First District of Texas

————————————

NO. 01-11-00702-CV

————————————

CHRISTOPHER BOEHRINGER AND
ENGINUITY ENGINEERING, INC., Appellants
V.
MARK A. KONKEL, Appellee

———

On Appeal from the 61st District Court
Harris County, Texas
Trial Court Cause No. 2009-11255

———

**O P I N I O N**

Appellants, Christopher Boehringer and Enginuity Engineering, Inc. ("EEI"), challenge the trial court's judgment, entered after a jury trial, in favor of appellee, Mark A. Konkel, in Konkel's suit against Boehringer and EEI for shareholder oppression. In five issues, Boehringer and EEI contend that the

evidence is legally and factually insufficient to support the jury's findings that Boehringer refused to allow Konkel to examine EEI's books, awarded himself excessive salaries and compensation, and withheld payment of dividends to Konkel; Konkel failed to "establish shareholder oppression as a matter of law;" and the evidence is factually insufficient to support the jury's finding on their claims that Konkel violated the Federal Wiretap Act.[1]  We affirm.

## Background

Konkel, who Boehringer met in the late 1990s when they both worked for Lubrizol Corporation in Deer Park, Texas, became a shareholder in Boehringer's close corporation in 2001.  Konkel bought 49.9% of the stock for $499, and the first shareholder meeting ended with the election of Subchapter S corporation status[2]  and salaries set at $60,000 annually for both men. Boehringer acted as president, and Konkel as vice president.  Both men are chemical engineers, and the company designed industrial processes and machinery and equipment used in refineries, chemical plants, biofuel facilities, and pharmaceutical production facilities.

---

[1]     *See* Wire and Electronic Communications Interception and Interception of Oral Communications, 18 U.S.C.A. §§ 2510–2522 (2008).

[2]     S*ee generally* 26 U.S.C.A. § 1361 (2010).

From 2001 to 2004, the company was a two-man operation, with both men working independently on contracts. In 2005, the company began using the name "Enginuity Engineering, Incorporated," and it acquired office space, hired employees, and earned significant revenue. The two men did not discuss compensation aside from their annual salaries and splitting the corporation's profits. Between 2005 and 2008, EEI's annual sales were in excess of $1 million compared to 2004 sales of $550,000.

Shortly after this marked success, the relationship between Konkel and Boehringer deteriorated. Konkel did not live up to Boehringer's expectations; he filed invoices late, failed to renew necessary software subscriptions, and kept irregular office hours. Likewise, Boehringer did not live up to Konkel's expectations; he became verbally abusive to Konkel and other employees. Some employees quit because of the abuse; some testified at trial about the abuse that they endured from Boehringer. When Konkel drafted an employee handbook, suggested a formalized holiday schedule, and attempted to outline corporate policies, Boehringer refused to consider them as he did not want to be held to policies. And, when Konkel made between ten and twenty requests for EEI's corporate records from between 2001 and 2009, Boehringer honored none of the requests, other than providing to Konkel a one-page spreadsheet that Boehringer created.

3

The situation reached its boiling point at the February 2, 2009 shareholder meeting. When Boehringer personally handed notice of the meeting to Konkel, he told Konkel that he was "going to make [Konkel's] fucking life miserable." On every issue presented at the meeting, at which Boehringer's lawyer kept minutes, Boehringer voted his 501 shares against Konkel's 499, with Konkel losing every measure. With Boehringer voting his 501 shares, he made his wife vice president, replacing Konkel. Also, Boehringer voted to make EEI's Subchapter S status revocable upon his own behest, and he created restrictions on the sale of stock.

During the meeting, Konkel read from a statement, reiterating his previous requests for company records. Boehringer agreed to provide three years of EEI's tax returns, but only if Konkel signed a confidentiality agreement. And when Konkel requested his share certificates, Boehringer would not provide them.

Following the shareholder meeting, Boehringer sent a company-wide email stating that Konkel was no longer in management. Boehringer instructed Konkel, through his attorney, to work out of his house because his presence in the office made Boehringer uncomfortable. He then locked Konkel out of the company's software development computer and the office.

On March 11, 2009, Boehringer instructed Konkel to be in the office between 7:00 a.m. and 5:00 p.m. Monday through Thursday and alternating

4

Fridays. Konkel resigned from EEI the next day, stating that his only remaining connection to the corporation was as a shareholder.

Later, Konkel learned that Boehringer had secretly awarded himself a pay raise in late 2008. In 2009, Boehringer's gross pay was increased to $240,000 annually, compared to Konkel's $48,000. Boehringer testified that he did not give Konkel a raise because he "did not deserve a raise in salary based on his actions in 2007 and 2008." Boehringer also testified that he had been advised to raise his own salary because it was too low and might trigger an Internal Revenue Service ("IRS") audit.

Despite years of splitting EEI's profits according to the share percentages owned, Boehringer did not issue dividends for 2008. Typically, in late December of each year, Boehringer would estimate yearly profits and report to Konkel that number, which Konkel would use to calculate his taxes and submit a payment to the IRS. At the close of a fiscal year, Boehringer would finalize and report official earnings for tax corrections. In December 2008, Boehringer released the preliminary earnings, and at the February 2 shareholder meeting, he released the final numbers. Although Konkel used these calculations to submit $76,500 in taxes to the IRS, Boehringer never issued to Konkel the dividends from EEI's 2008 earnings. Boehringer testified that he did not do so because he was concerned about meeting EEI's financial obligations.

Before May 29, 2007, Konkel "checked a box" on the website of EEI's e-mail provider, directing the e-mail provider to make administrative copies of Boehringer's e-mail. E-mails addressed to Boehringer were then forwarded to Konkel's e-mail account.

On February 23, 2009, Konkel filed the instant suit against Boehringer and EEI, alleging shareholder oppression. He later added causes of action for breach of contract, breach of fiduciary duty, and fraudulent transfer. He also sought a declaratory judgment regarding ownership of a computer program that he had developed, to pierce the corporate veil, and obtain attorneys' fees. Boehringer filed a counterclaim against Konkel for alleged violations of both the Texas[3] and Federal wiretap statutes.

The jury found that Boehringer had maliciously or wrongfully refused to allow Konkel to examine EEI's books, used his position to award himself an excessive salary to Konkel's detriment, and withheld EEI dividends from Konkel in 2008. The trial court had previously entered a partial summary judgment in favor of Boehringer on his contentions against Konkel for violations of the Texas and Federal Wire Tap Acts. The question of damages for any wiretap violations

---

[3]      *See* TEX. CIV. PRAC. & REM. CODE ANN. § 123.002(a)(1)–(2) (Vernon 2011).

6

was submitted to the jury, which found that Konkel violated the acts "0" times and incurred "0" damages.

In its final judgment, the trial court found that shareholder oppression occurred as a matter of law. It ordered, in equitable relief, that the corporation be liquidated, with proceeds split according the share distribution after all debts were subtracted. And it further ordered that Boehringer take nothing on his counterclaims for the alleged violations of the wiretap acts.

## Legal and Factual Sufficiency

In their first, second, and third issues, Boehringer and EEI complain that the evidence is legally and factually insufficient to support the jury findings that Boehringer maliciously or wrongfully refused to allow Konkel to examine EEI's books and records, awarded himself excessive salaries and compensation, and withheld payment of dividends to Konkel.

We will sustain a legal-sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal-sufficiency review, a "court must consider evidence in the light

7

most favorable to the verdict, and indulge every reasonable inference that would support it." *Id.* at 822. The term "inference" means,

> In the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved . . . .

*Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 400 (Tex. App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.) (citing BLACK'S LAW DICTIONARY 700 (5th ed. 1979)). For a jury to infer a fact, "it must be able to deduce that fact as a logical consequence from other proven facts." *Id.*

If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). "'[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.'" *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller*, 168 S.W.3d at 822; *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). "A reviewing court cannot substitute its judgment for that of the trier-

of-fact, so long as the evidence falls within this zone of reasonable disagreement." *City of Keller*, 168 S.W.3d at 822.

In conducting a factual-sufficiency review, we must consider, weigh, and examine all of the evidence that supports or contradicts the jury's determination. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *PlasTex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). We note that the jury is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). We may set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong or manifestly unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986).

"The doctrine of shareholder oppression protects the close corporation minority stockholder from the improper exercise of majority control." Douglas Moll, *Majority Rule Isn't What It Used To Be: Shareholder Oppression in Texas Close Corporations*, 63 TEX. B.J. 434, 435 (2000). This Court has held that there are two non-exclusive definitions of shareholder oppression:

1. majority shareholders' conduct that substantially defeats the minority's expectations that, objectively viewed, were both reasonable under the circumstances and central to the minority shareholder's decision to join the venture; or

2. burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company's affairs to the prejudice of some members; or a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

*Willis v. Bydalek*, 997 S.W.2d 798, 801 (Tex. App.—Houston [1st Dist.] 1999, pet. denied); *see also Ritchie v. Rupe*, 339 S.W.3d 275, 289 (Tex. App.—Dallas 2011, pet. granted).

In determining whether majority shareholder conduct rises to the level of oppression, we exercise caution, balancing the minority shareholder's reasonable expectations against the corporation's need to exercise its business judgment and run its business efficiently. *Ritchie,* 339 S.W.3d at 289. As we observed in *Davis v. Sheerin*, however, "[c]ourts take an especially broad view of the application of oppressive conduct to a closely-held corporation, where oppression may more easily be found." 754 S.W.2d 375, 381 (Tex. App.—Houston [1st Dist.] 1988, writ denied). It is within the province of a jury as factfinder to determine whether certain acts occurred when those acts are disputed. *Ritchie*, 339 S.W.3d at 289. The determination of whether those facts constitute shareholder oppression toward a minority shareholder is a question of law for the trial court. *Davis*, 754 S.W.2d at 380; *See Ritchie*, 339 S.W.3d at 289. A claim of oppressive conduct can be independently supported by evidence of a variety of conduct. *Davis*, 754 S.W.2d at 380. Oppressive conduct is an independent ground for relief that does not

10

require a showing of fraud, illegality, mismanagement, wasting of assets, or deadlock. *Id.* at 381–82.

In regard to the first definition of shareholder oppression, we note that when determining whether a minority shareholder's reasonable expectations were substantially defeated, we distinguish between those specific reasonable expectations and general reasonable expectations. *Ritchie*, 339 S.W.3d at 290. Specific expectations will require proof of specific facts giving rise to the expectations in a particular case and a showing that the expectation was reasonable under the circumstances of the case as well as central to the minority shareholder's decision to join the venture. *Id*. at 291. Examples of specific reasonable expectations are employment in the corporation or a role in management. *Id*.

General reasonable expectations are expectations that arise from the mere status of being a shareholder. *Id*. These expectations belong to all shareholders and, absent evidence to the contrary, are both reasonable and central to the decision to invest in the corporation. *Id*. Examples of general reasonable expectations are the right to proportionate participation in the earnings of the company, the right to any stock appreciation, the right, with proper purpose, to inspect corporate records, and the right to vote if the stock has voting rights. *Id*. at 291–92.

*Access to EEI's Books and Records*

In their first issue, Boehringer and EEI assert that the evidence is legally and factually insufficient to support the jury's finding that Boehringer maliciously and wrongfully refused to allow Konkel to examine EEI's books and records. Jury Question One asked:

> Do you find from a preponderance of the evidence that Chris Boehringer maliciously or wrongfully refused to allow Mark Konkel to examine the books and records of Enginuity Engineering, Inc.?

Boehringer and EEI do not challenge Jury Question One as defective on appeal, nor do they complain about the trial court's denial of their tendered charge on this question. Accordingly, we will not review any objection to the charge that they made at trial.[4] Boehringer and EEI acknowledge that they did not raise a separate issue on the jury charge, but urge us to consider the correctness of Jury Question One as subsidiary to their legal- and factual-sufficiency issue. However, an

---

[4] Boehringer and EEI first objected to this jury question on statute-of-limitations grounds and they asked that the jury be instructed to consider Konkel's requests for EEI's records after February 23, 2007 only. Next, Boehringer and EEI objected that the proper predicate had not been laid and a proper predicate for the question would have required the question to ask whether a written request for a proper purpose had been made for the corporate books. *See Chavco Inv. Co. v. Pybus*, 613 S.W.2d 806, 809 (Tex. App.—Corpus Christi 1981, writ ref'd n.r.e.). Boehringer and EEI further asked that "proper purpose" be defined as "whether the inspection is directed toward obtaining information bearing upon the protection of the shareholder's interest and that of other shareholders in the corporation." The trial court overruled their objections and denied the tendered charge.

12

appellant's brief must "state concisely all issues or points presented for review." TEX. R. APP. P. 38.1(f). Rule 38.1(f) also compels that this Court treat the statement of an issue or point "as covering every subsidiary question that is fairly included." *Id*.

Boehringer and EEI have cited no authority, nor have we found any, considering a challenge to a jury question as a subsidiary question to a legal- and factual-sufficiency issue on appeal. Accordingly, we will review the sufficiency of the evidence under the question asked and the instructions actually given. *See Osterberg v. Peca*, 12 S.W.3d 31, 33 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence."); *see also Cathy v. Meyer*, 115 S.W.3d 644, 659–50 (Tex. App.—Waco 2003), *aff'd in part, rev'd in part on other grounds*, 167 S.W.3d 327 (Tex. 2005) (considering sufficiency issue, but concluding waiver where appellant had not raised as issue on appeal his objections to wording of jury charge).

Konkel testified that he "made more than ten, less than 20" requests for EEI's records over a period of eight and a half years, including requests in each year from 2001 to 2005. During this time, Boehringer did not provide access to bank records or tax returns or any other EEI records, with one exception: after one of Konkel's requests, Boehringer provided a one-page ledger sheet that he drafted himself.

Konkel also made a written request for EEI's financial records in 2007. In two e-mails, dated May 24 and 25, 2007, Konkel wrote to Boehringer as follows:

> I also need a complete detailed ledger report for our cash flow for all of last year, and this year as of April. I do have a vested interest in seeing where our money is being spent. A report from QuickBooks listing check number – paid to – amount – date is all I am looking for. Then every month after that. Nothing less than I would easily get from an accounting firm.

Konkel's statement that he had a vested interest in seeing how the company's money was being spent constitutes a statement of a proper purpose for which the request was made. Boehringer responded, via e-mail, "We will address this sometime next week prior to a Board Meeting." Konkel testified, however, that there was no board meeting scheduled or held and Boehringer did not offer any contrary evidence. And Boehringer admitted that he never gave Konkel any tax returns or any bank statements.

The minutes of the February 2, 2009 shareholder meeting document another request by Konkel for EEI's books and records and contain a copy of Konkel's written request made the same day:

> 1) I, Mark Konkel, need to see and to have the opportunity to copy all original banking documents available, or electronic bank documents, if originals are not available, including, but not limited to all cancelled checks, deposit slips, bank statements, wire transfers – everything regarding any transfers of money to the corporation.

> 2) I need to see and be able to copy all corporate documents I have not seen.

14

In response, Boehringer offered access to only the last three years of tax returns provided that Konkel sign a confidentiality statement. Konkel testified that he was not provided any corporate records until they were ordered produced for this lawsuit.

Boehringer further argues there is legally- and factually-insufficient evidence to support a finding that he withheld EEI's records maliciously or wrongfully. In Jury Question One, the trial court instructed the jury that:

> A person acts "maliciously" when his actions are accompanied by ill-will, bad or evil motive, or such gross indifference to the rights of others as will amount to a willful or wanton act, done without just cause or excuse.

> "Wrongfully" means an act committed with evil intent, with legal malice, without reasonable ground for believing the act to be lawful, and without legal justification.

As Boehringer and EEI note, the admitted ill-will between Boehringer and Konkel does not automatically establish ill-will in regard to Konkel's requests for EEI's records. Malice can be established by direct or circumstantial evidence. *See Seber v. Union Pac. R.R. Co.*, 350 S.W.3d 640, 654 (Tex. App.—Houston [14th Dist.] 2011, no pet.).

As a shareholder, Konkel had a general and reasonable expectation to have access to review EEI's corporate records. Although there is evidence that Boehringer did provide Konkel with a ledger sheet after one of his requests to see

15

EEI's records, Boehringer did not respond to Konkel's repeated requests for records. And there is evidence that Boehringer acted with ill-will, bad or evil motive, or gross indifference to Konkel's rights as a shareholder. When Boehringer responded to Konkel's written request in 2007, he did not provide or agree to provide the requested records, he simply said, "We will address this sometime next week prior to a Board Meeting." There is evidence that there was no actual board meeting scheduled and this was Boehringer's way of threatening Konkel, reminding him that he was the majority shareholder, and controlled Konkel as the minority shareholder. Boehringer did not offer any evidence of justification for his refusal to provide EEI's corporate records after Konkel had asked to see them. The jury could have reasonably inferred from the evidence presented that Boehringer's refusal to provide EEI's corporate records stemmed from ill-will, bad or evil motive, or gross indifference to Konkel's rights as a shareholder in the corporation.

Viewing the evidence in the light most favorable to the jury's finding and indulging every reasonable inference that would support it, we conclude that the jury could have reasonably found that Boehringer maliciously or wrongfully refused to allow Konkel to examine EEI's book and records. We further conclude that the evidence supporting this finding is not so weak as to render the jury's verdict clearly wrong and manifestly unjust. Accordingly, we hold that the

16

evidence is legally and factually sufficient to support the jury's finding that Boehringer maliciously or wrongfully refused to allow Konkel to examine EEI's books and records.

We overrule Boehringer and EEI's first issue.

### *Excessive Salary and Compensation*

In their second issue, Boehringer and EEI assert that the evidence is legally and factually insufficient to support the jury's finding that Boehringer maliciously or wrongfully awarded himself an excessive salary. Jury Question Two asked:

> Do you find from a preponderance of the evidence that Chris Boehringer maliciously or wrongfully used his position as the President of Enginuity Engineering, Inc. to award excessive salaries and compensation to himself to the detriment of Mark Konkel?

An expectation of annual compensation through employment cannot be said to be a general expectation held by all shareholders of a corporation. *See ARGO Data Res. Corp. v. Shagrithaya*, 380 S.W.3d 249, 266 (Tex. App.—Dallas 2012, pet. filed). Accordingly, if Konkel was complaining about his annual salary from EEI, he would be required to provide proof of specific facts showing that his specific expectation of a certain level of compensation was reasonable under the circumstances and central to his decision to join EEI. However, Konkel is not complaining about his own compensation, but that Boehringer's raising of his own salary was detrimental to Konkel.

The minutes of the August 4, 2001 Boehringer & Associates shareholder meeting, during which Konkel joined the company as a 49.9% shareholder, contain the board resolution declaring that Boehringer, as president, and Konkel, as vice-president, would both receive $60,000 annually as salary, "until such salary shall be changed by the Shareholders at the annual or special meeting called for that purpose." Konkel testified that he and Boehringer never discussed salaries after that time, although Boehringer would make statements to him such as, "We're going to pay ourselves 40,000 this year." And Konkel was never paid more than $70,000 a year.

In 2009, Boehringer unilaterally increased his own salary to $20,000 per month (gross), and he received that salary for at least five months despite testifying that at the beginning of 2009, "[B]usiness started to dry up, you know, drastically. And we were getting in a position where there was a cash crunch." At the same time, Boehringer did not raise Konkel's salary as vice president, stating that Konkel "didn't deserve a raise in salary." In the first two months of 2009, Konkel's net monthly salary was $1,937.28 and $1,677.00 while Boehringer's was $14,700.00. Boehringer testified that he was advised to raise his salary because a low salary might trigger an IRS audit as his low salary was so disproportionate to the annual corporate revenue of EEI as a Subchapter S corporation. Boehringer explained that this was why he then raised his own salary, despite his concerns

18

about "running out of funds in 2009 to meet the obligations . . . to our different creditors, the rent, software leases, maintenance on software utilities." Boehringer noted that that because EEI was a Subchapter S corporation, he needed to pay himself a reasonable salary and his salary was unreasonably low. There is no evidence that, in previous years, Boehringer and Konkel's salaries had been different or their corporate profit distributions had ever been different based on their 49.9% / 50.1% net profit split.

Boehringer and Konkel's business relationship started with an agreement that each would receive a $60,000 yearly salary. This supports an inference that they viewed their contributions to the corporation as equal. And the near equal split in stock and split of profits based on stock ownership percentages further supports this inference. Moreover, there is no evidence of a significant shift in the nature, extent, and scope of their work that would warrant a substantial difference in the salaries of Boehringer and Konkel. Thus, the jury could have reasonably inferred that Boehringer awarded himself an excessive salary.

Boehringer next asserts that there is insufficient evidence to support the finding that Boehringer acted maliciously or wrongfully in raising his salary. After he informed Konkel that he would make Konkel's life "miserable," Boehringer did not issue yearly dividends and claimed economic hardship for EEI. Yet, despite this hardship, he increased his own salary while denying a pay raise to Konkel,

claiming he "didn't deserve a raise in salary." Boehringer did not inform Konkel, an interested shareholder, of his significant pay raise, nor is there evidence of an annual or special shareholder meeting to change the corporate officers' salaries as provided in the board resolution from 2001. Prefacing his actions with an expressed intent to make Konkel's life "miserable" supplies evidence of Boehringer's bad motive. Additionally, granting himself a secret pay raise defeats Boehringer's stated motivation for denying dividends, economic hardship.

As a shareholder, Konkel had a general and reasonable expectation to have the right to proportionate participation in the earnings of the company. Based on the board resolution from the first shareholder meeting at which Konkel joined the company he had a reasonable expectation that corporate money would be divided equally between Boehringer and him as the two shareholders, based on their proportionate ownership of shares. The board resolution provided for an equal salary that would be changed only by the shareholders at an annual or special meeting. The jury could have reasonably inferred from the evidence presented that Boehringer used his position as president of EEI to award himself an excessive salary to Konkel's detriment.

Viewing the evidence in the light most favorable to the jury's finding and indulging every reasonable inference that would support it, we conclude that the jury could have reasonably found that Boehringer wrongfully awarded himself an

20

excessive salary to Konkel's detriment. We further conclude that the evidence supporting this finding is not so weak as to render the jury's verdict clearly wrong and manifestly unjust. Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's finding that Boehringer maliciously or wrongfully used his position as president of EEI to award himself excessive salaries and compensation to the detriment of Konkel.

We overrule Boehringer and EEI's second issue.

***Withholding Dividend Payments***

In their third issue, Boehringer and EEI assert that the evidence is legally and factually insufficient to support the jury's finding that he used his position as president of EEI to maliciously or wrongfully direct the withholding of dividend payment to Konkel in 2008. EEI was set up as a Subchapter S corporation, and the evidence shows that Boehringer and Konkel split the corporation's net profits based on their respective ownership of 50.1% and 49.9% of the shares each year between 2001 and 2007.

Konkel testified that Boehringer would disclose preliminary yearly profits in late December of each year and then provide the final numbers in January. Konkel would use these preliminary figures to file his taxes and avoid late penalties. In 2008, Konkel paid $75,000 in taxes based on Boehringer's statement to him that EEI's net profit for 2008 was $574,000 minus Konkel's expenses. After

21

Boehringer provided final numbers at the February 2, 2009 shareholder meeting, Konkel corrected his $75,000 tax payment with an additional $1,500 in taxes to avoid a penalty. Konkel gave the following undisputed testimony at trial:

COUNSEL: Okay. Now, in 2009 were you ever paid the K1 by Mr. Boehringer?

KONKEL: No, sir.

COUNSEL: Was there any indication at all throughout the entire [Feb 2, 2009] shareholders meeting that you were not going to be paid your share of the net profits?

KONKEL: No.

Konkel's statement that he received no payments in 2009 referred to the 2008 dividend. Boehringer testified that he did not pay himself a K-1 distribution for 2008, even though he paid the IRS $86,000 as a pre-tax payment on January 15, 2009. He stated that when the time came to pay the 2008 dividend, certain creditor accounts had not been paid, and, after those payments, there was no money left to be distributed. Boehringer explained that he did not believe that the $574,000 that he had estimated as net profits for 2008 was "cash in the bank" at the time he made the estimate.

The right to proportionate participation in the earnings of a company is a general reasonable expectation of any shareholder. S*ee ARGO*, 380 S.W.3d at 265. A minority shareholder's rights may be impacted if he is prevented from sharing in

22

the profits of the company.  *See id.*  A shareholder does not, on the other hand, have a general reasonable expectation about the compensation levels of the corporation's executives.  *Id.* (citing *Ritchie*, 339 S.W.3d at 292).  Therefore, Konkel needed to demonstrate that Boehringer received compensation in excess to what was reasonable for his position and level of responsibility such that he received a de facto dividend to the exclusion of Konkel.  *See ARGO*, 380 S.W.3d at 268; *see also Gibney v. Culver*, No. 13-06-112-CV, 2008 WL 1822767 at *16 (Tex. App.—Corpus Christi Apr. 24, 2008, pet. denied) (mem. op).

A shareholder does not have a general expectation of receiving a dividend. *ARGO*, 380 S.W.3d at 270.  Corporations are not required to issue dividends under Texas law.  *See* Act of May 14, 1987, 70th Leg., R.S., ch. 93, art. 2.38-1, 1987 Tex. Gen. Laws 203, 213, expired Jan. 1, 2010, Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 2, 2003 Tex. Gen. Laws 267, 595 (current version at TEX. BUS. ORGS. CODE ANN. § 21.302 (Vernon 2012)).

Here in 2009, after Boehringer had promised to make Konkel's life "miserable," Boehringer, as president of EEI, withheld the K-1 distribution of profits for the 2008 fiscal year.  The jury could have reasonably inferred from the evidence about the non-payment of a corporate dividend for 2008 and 2009, and Boehringer's increase in his own salary to a $20,000 monthly gross payment, that Boehringer gave himself a de facto dividend to the exclusion of Konkel as the

23

minority shareholder. It is true that because neither shareholder received a dividend for 2008, EEI's corporate earnings were "distributed" to Konkel to the same extent that they were "distributed" to Boehringer. However, in the context of a corresponding salary increase for Boehringer, the jury could have concluded that Boehringer withheld issuance of a dividend and used his two-fold pay increase as a means of denying Konkel his proportionate participation in the company's earnings as a shareholder.

The jury could have reasonably inferred from the evidence presented that Boehringer used his position as president of EEI to maliciously or wrongfully direct the withholding of payment of dividends from EEI to Konkel in 2008.

Viewing the evidence in the light most favorable to the jury's finding, and indulging every reasonable inference that could support it, we conclude that the jury could have reasonably found that Boehringer wrongfully withheld the payment of the 2008 corporate dividend while increasing his own salary to Konkel's detriment. We further conclude that the evidence supporting this finding is not so weak as to render the jury's verdict clearly wrong and manifestly unjust. Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's findings that Boehringer maliciously or wrongfully used his position as president of EEI to direct the withholding of payment of dividends from EEI to Konkel in 2008.

24

We overrule Boehringer and EEI's third issue.

## Shareholder Oppression

In their fourth issue, Boehringer and EEI argue that because the evidence is insufficient to support the above jury findings, the trial court erred in finding that they engaged in shareholder oppression as a matter of law. Whether certain conduct constitutes shareholder oppression is a question of law. *Willis,* 997 S.W.2d at 801. We review questions of law de novo. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 239 (Tex. 2003). Specifically, we review the trial court's legal conclusions drawn from the facts to determine their correctness. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

"Because any one of a variety of activities or conduct can give rise to shareholder oppression, the fact that there may be a lack of evidence to support the existence of one such activity does not defeat the claim so long as there is evidence to support that another such instance of conduct occurred." *Redmon v. Griffith*, 202 S.W.3d 225, 234 n.3 (Tex. App.—Tyler 2006, pet. denied). Denying access to company books or records, paying excessive compensation, and wrongfully withholding dividends are typical wrongdoings found in shareholder oppression cases. *Willis*, 997 S.W.2d at 801–802 (describing fact patterns in various shareholder oppression cases).

Here, all three of the above jury findings regarding certain acts by Boehringer relate to general reasonable expectations that any shareholder would have based on his mere status as a shareholder of a corporation. *See Ritchie*, 339 S.W.3d at 291–92 (explaining difference between general and specific reasonable expectations of shareholders and giving examples of both). Absent evidence to the contrary, these expectations are reasonable under the circumstances and central to the decision to invest in a corporation. *See id.*

Conduct of majority shareholders that substantially defeats the reasonable expectations of a minority shareholder will often be conduct that is "burdensome," "harsh," or "wrongful," or constitutes "a lack of probity and fair dealing in the company's affairs" or "a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely." *See id.* at 294. The trial court could have reasonably concluded, based on the jury's findings, that Boehringer acted oppressively toward Konkel by refusing to allow him access to EEI's corporate records and not issuing him a dividend in 2008, while at the same time granting himself an excessive salary without any shareholder vote or resolution.

In addition to the jury's findings and the evidence outlined above, there is evidence that Boehringer locked Konkel out of EEI's office and his software development computer. Boehringer also sent a company-wide e-mail stating that

26

Konkel was no longer part of management and employees were not "to listen to Konkel anymore." As the majority shareholder, at the February 2, 2009 shareholder meeting, Boehringer also voted in restrictions on the sale of Konkel's stock. *See Ritchie*, 339 S.W.3d at 292–93 (citing *Sandor Petroleum Corp. v. Williams*, 321 S.W.2d 614, 616–17 (Tex. Civ. App.—Eastland 1959, writ ref'd n.r.e.) (noting general reasonable expectation of shareholder of being able to sell unrestricted shares of stock).

The three acts found by the jury to have occurred in this case substantially defeated Konkel's general reasonable expectations as a shareholder. Sufficient evidence supported the jury findings, and any one of the acts alone would support the trial court's finding of shareholder oppression. Accordingly, we hold that the trial court did not err in finding shareholder oppression as a matter of law.

We overrule Boehringer and EEI's fourth issue.

## Federal Wiretap Act

In his fifth issue, Boehringer argues that the evidence is factually insufficient to support the jury's finding that Konkel violated the Federal Wiretap Act "0 days" because he had proved the "answer" had to be "1447 days."

Prior to trial Boehringer moved for partial summary judgment, seeking an affirmative finding that Konkel had violated the Texas and Federal Wiretap Acts, which the trial court granted.

27

In Jury Question Eight, the trial court informed the jury that it had previously determined that Konkel had violated the Federal Wiretap Act and it was up to the jury to determine the amount of damages that Boehringer could recover. Then, the trial court asked the jury to determine the number of days that Konkel had violated the Federal Wiretap Act.[5] It instructed the jury that either of three separate acts could constitute a separate violation: (1) an interception of an e-mail intended for Boehringer; (2) a disclosure of such an e-mail or its contents to another person; and (3) an intentional use of such e-mail and its contents.

The jury answered that Konkel had violated the Federal Wiretap Act "0 days." Boehringer moved for a judgment notwithstanding the jury verdict in regard to the Federal Wiretap Act, which was denied by the trial court. On appeal, Boehringer does not challenge the jury question as it was submitted to the jury, he argues only that the evidence is factually insufficient to support the jury's finding.

When a party challenges the factual sufficiency of the evidence on a finding on an issue upon which that party had the burden of proof, that party must demonstrate that the adverse finding is against the great weight and preponderance

---

[5]     Damages for violating the Federal Wire Tap Act are assessed as the greater of $100 a day for each day of violation or $10,000. 18 U.S.C.A. § 2520 (c)2(B) (2008). Under the Texas Wiretap Act, a claimant is entitled to injunctive relief and statutory damages of $10,000 for each occurrence in addition to actual damages in excess of $10,000, reasonable attorney's fees, and punitive damages. TEX. CIV. PRAC. & REM. CODE ANN. § 123.004 (Vernon 2011).

of the evidence. *Francis*, 46 S.W.3d at 242; *R.B. Hardy & Sons, Inc. v. Hoyer Global (USA), Inc.*, No. 01-09-00041-CV, 2010 WL 2305753, at \*3 (Tex. App.—Houston [1st Dist.] June 10, 2010, pet. denied). We must consider and weigh all of the evidence and set aside the finding only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Id*. We note that the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Jackson*, 116 S.W.3d at 761.

The Federal Wiretap Act provides a private right of action against one who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a) (2008); *see* 18 U.S.C. § 2520 (2008) (providing private right of action). The Federal Wiretap Act defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id*. § 2510(4) (2008). Thus, Boehringer had to establish five elements to make his claim: that Konkel (1) intentionally (2) intercepted, endeavored to intercept, or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication (5) using a device.

Although the trial court granted summary judgment on liability under the Federal Wiretap Act, it further instructed the jury on acts that constituted separate

29

violations of the act. Thus, the jury was asked to determine the number of days that Konkel violated the act based on an instruction that spoke to liability under the statute.

Boehringer's forensic computer expert, Paul Price, found in Konkel's e-mail inbox 3,118 emails addressed to Boehringer along with other emails addressed to other EEI employees. Price testified that the emails were not supposed to be in Konkel's inbox because he was not the intended recipient, but he could not testify as to whether the emails were intercepted or copied. Price further testified that Boehringer's e-mails were reviewed by Konkel for 447 days based on Price's adding up the number of days that the emails were received.

Konkel testified that he directed his e-mail provider to make administrative copies of exempt employees' e-mails by checking a box on the e-mail provider's company website. And he testified that he did not "intercept" the emails as follows:

> COUNSEL: Okay. So, the stored communication, stored e-mail, was copied?
>
> KONKEL: That's correct.
>
> COUNSEL: It was not intercepted?
>
> KONKEL: It's impossible to intercept it with the system I was using.

The Federal Wiretap Act does not apply to electronic communications that are in storage. *See Steve Jackson Games, Inc. v. U.S. Secret Serv.*, 36 F.3d 457, 461–62 (5th Cir. 1994). Boehringer presented no evidence that Konkel disclosed the e-mails or their contents to another person or evidence of the intentional use of the e-mails or their contents. We conclude that the jury's finding that Konkel violated the Federal Wiretap Act "0 days" is not so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. Accordingly we hold that the evidence is factually sufficient to support the jury's finding.

We overrule Boehringer's fifth issue.

### Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice


Panel consists of Justice Jennings, Higley, and Sharp.

31