**Opinion issued April 10, 2014**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-12-01058-CV

———————————

### JOANN BATEY, Appellant

### V.

### PAUL DROLUK, INTERCONTINENTAL BEARING SUPPLY COMPANY, AND JACK O'DONNELL, Appellees

---

On Appeal from the 127th District Court
Harris County, Texas
Trial Court Case No. 2007-40422

---

## MEMORANDUM OPINION

Appellant, JoAnn Batey, appeals from the trial court's take-nothing judgment in her suit against Paul Droluk and Jack O'Donnell for a declaratory judgment, breach of fiduciary duties, shareholder oppression, breach of contract, and fraud. In four issues, Batey argues the trial court abused its discretion by (1)

denying her request for a declaratory judgment, (2) determining Droluk and O'Donnell did not owe Batey any fiduciary duties, (3) determning Droluk and O'Donnell did not breach any fiduciary duties owed to IBSCO or to her, and (4) determining no shareholder oppression had occurred.

We affirm.

## Background

In 1981 Paul Droluk founded Intercontinental Bearing Supply Company (IBSCO) and hired JoAnn Batey as one of his original employees. Droluk served as President–CEO and Batey served as IBSCO's vice president. Batey and Droluk married in 1985, and he transferred over half of the company to her. Batey and Droluk are the only two shareholders in the company.

In the late 1990s, Droluk hired Jack O'Donnell to replace him as president of IBSCO. Droluk remained CEO of the company, but he left the day-to-day management of IBSCO to O'Donnell. As part of O'Donnell's compensation, Batey and Droluk promised him five percent of the company should it ever be sold. Additionally, O'Donnell joined Droluk and Batey on the Board of Directors.

A few months after O'Donnell's hiring, Batey and Droluk executed a "Post Marital Agreement." In the agreement, Batey promised, in the event of divorce, to transfer enough shares in the company to Droluk to make him the majority shareholder. In return, Droluk promised that if any future employment agreements

2

with O'Donnell entitled O'Donnell to additional stock, the stock would come from Droluk's shares. Batey and Droluk divorced in 2000, and Droluk became the majority shareholder.

In the years that followed, conflict arose between Batey and O'Donnell over the day-to-day management of IBSCO. In June 2002, Batey, Droluk, and O'Donnell entered into an agreement (the "2002 Agreement") to try to resolve the issues that had arisen between Batey and O'Donnell. The agreement stated,

> It has never been [Batey]'s intent to decrease her daily involvement with IBSCO. She was enthused to be working with a new President, Jack O'Donnell, and looked forward to promoting IBSCO together. Unfortunately, this situation did not work out for either party. [O'Donell] and [Batey]'s difference in day-to-day operational strategies cause continual friction between the two.
> This decision to minimize JoAnn's involvement is being made for the betterment of the company.
>
> Therefore, the parties agree to the following:
> - JoAnn [Batey] will continue to take notes and record in the corporate book the Stockholder minutes and the Board of Directors minutes held annually under the position of Secretary/Treasurer.
> - JoAnn will continue to hold the position of Vice President on the Board of Directors, ensuring her right to vote on company matters.
> - JoAnn will continue to perform ISO Audits as lead auditor for 4.1 Management Review and 4.17 Internal Audits as a minimum.
> - IBSCO will continue to give JoAnn her salary and benefits she was receiving prior to her reduced involvement
> - IBSCO will have the financial advisor . . . review annually if a cost of living increase is applicable.
>
> This agreement will remain in force until such time as JoAnn sells her shares or all three parties involved consent to any change.

3

The level of Batey's involvement in IBSCO after the 2002 Agreement is disputed. Batey testified that she visited the office twice a month to use the photocopier and to ship personal packages. During these visits, she would look around and make sure things were running smoothly. She also occasionally substituted for absent employees, signed documents that needed signing, and trained new collection employees.

Conflict between the parties arose again in 2003 when Droluk used company money to purchase a boat from China. Droluk moved to China, based at least in part on problems with the boat. Batey filed suit against Droluk, and the parties settled in December 2006.

While in China, Droluk founded Blue Line Precision Parts. He intended for his new company to sell parts to IBSCO. Droluk also saw China as a potential market for IBSCO's products. Droluk presented his ideas to the board. The board acknowledged there may be a need to hire a representative in China. Droluk testified that he hired Mike Peng to act as IBSCO's representative in China.

The details of Peng's employment are disputed. IBSCO has no paperwork documenting Peng's position or the services he provided IBSCO. Batey alleged that Peng was a Blue Line employee who did nothing of value for IBSCO. Droluk testified that Peng was an independent consultant who worked for both IBSCO and

4

Blue Line simultaneously. He also testified that IBSCO only paid Peng for services rendered on its behalf.

Around the same time, the board began discussing a plan to sell IBSCO. They hired DRDA, PLLC to appraise the value of their company. The valuation turned out to be much lower than hoped. DRDA informed the board that IBSCO had too much high-cost, slow-moving inventory.

The board asked DRDA to prepare a report suggesting methods to improve the company's value. DRDA completed its report, the "Financial Performance Review," in April 2006. The report stated that IBSCO could save $300,000 per year by disposing of $1.5 million of slow moving inventory. The report was never discussed in a board meeting, and Batey was not given a copy of the report.

Though the report itself was never discussed, the board continued to discuss the slowing inventory turnover rate. The board agreed to look into selling some of IBSCO's excess inventory, but no reduction ever took place.

In January 2007, Batey visited IBSCO to speak with O'Donnell about hiring a new employee. During her visit, she discovered the locks to the building had been changed without her knowledge. She requested a new key and eventually received one.

Conflict arose again in March 2007. Batey appeared at IBSCO five consecutive business days in a row. She fired an employee, tried to hire another,

and undertook various other projects. Droluk sent Batey an email informing her that her recent involvement violated the 2002 Agreement and that her access to IBSCO's premises was limited to Board of Directors meetings. He also stated that if she failed to abide by the agreement, she would be removed from the board and her position as the board's treasurer and vice president. O'Donnell sent an email to all IBSCO employees informing them of her limited role in the company. The email stated that Batey was not allowed to enter IBSCO's premises or to contact company employees directly.

Batey responded by filing the underlying suit against Droluk and O'Donnell in July of 2007. She sought a declaratory judgment affirming the Post Marital Agreement and finding that Droluk's and O'Donnell's emails had no force or effect as a corporate act of IBSCO. She also brought a breach of fiduciary duty claim, a shareholder derivative action, and a shareholder oppression claim.

In her declaratory judgment action concerning the Post Marital Agreement, Batey alleged Droluk had denied the agreement's enforceability in an oral conversation. In court, Droluk acknowledged the agreement was valid and enforceable and denied ever claiming otherwise. The trial court ruled the claim was not justiciable.

Batey also sought a declaratory judgment that O'Donnell's email violated the 2002 Agreement. Specifically, she objected to being barred from IBSCO's

premises and her prohibition from contacting company employees. The trial court found the 2002 Agreement did not entitle Batey to come on the company's premises at her discretion. The court also ruled that Batey's claim was not justiciable.

In addition to her declaratory judgment requests, Batey also alleged that Droluk and O'Donnell breached fiduciary duties owed to her. The court found that no relationship existed between the parties that gave rise to a fiduciary duty.

Batey also brought a shareholder derivative action claiming Droluk had breached fiduciary duties owed to IBSCO. She alleged Droluk breached his fiduciary duties by using his company business card to pay for personal expenses, having IBSCO pay a Blue Line employee (Peng), and charging IBSCO for his moving expenses when he moved back to Houston in 2009. The trial court determined that payments to Peng were for services done for IBSCO's benefit and that Droluk had not breached any fiduciary duties.

As part of her shareholder derivative claim, Batey alleged Droluk and O'Donnell breached their fiduciary duties to IBSCO by holding too much inventory. IBSCO's operation's manager, Jamee Reed, presented testimony that large inventory holdings were necessary in order to keep clients happy. Additionally, Batey offered evidence suggesting that, even with IBSCO's slow

inventory turnover, the company was just as profitable as the industry average. The trial court determined there was no breach of fiduciary duty.

Finally, Batey claimed she was a victim of shareholder oppression. She argued that her expectation of a meaningful participation in management was not met when she was locked out of the building and prohibited from entering the premises or communicating with employees without permission. Additionally, she argued her expectation to be able to vote on company matters was not met when Droluk and O'Donnell failed to provide her with a copy of the Financial Performance Review. The trial court found no action singled out Batey as an individual shareholder and her reasonable expectations as a shareholder had not been violated.

### Standard of Review

When the appellate record includes the reporter's record, the trial court's factual findings, whether express or implied, are not conclusive and may be challenged for legal and factual sufficiency of the evidence supporting them. *Zenner v. Lone Star Striping & Paving, L.L.C.*, 371 S.W.3d 311, 314 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). We review the sufficiency of the evidence supporting a trial court's challenged findings of fact by applying the same standards that we use in reviewing the legal or factual sufficiency of the evidence supporting jury findings. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994).

In conducting a legal sufficiency review, we credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We consider the evidence in the light most favorable to the finding and indulge every reasonable inference that would support it. *Id*. at 822. We will sustain a no-evidence point only if (1) the record reveals a complete absence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810; *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). If more than a scintilla of evidence exists to support the finding, the legal sufficiency challenge fails. *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005) (citing *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998)).

In conducting a factual sufficiency review, we consider and weigh all of the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). The trial court acts as the factfinder in a bench trial, and it is the sole judge of the credibility of witnesses. *See Zenner*, 371 S.W.3d at 314. As long as the evidence at trial "would enable reasonable and fair-minded

people to differ in their conclusions," we will not substitute our judgment for that of the factfinder. *City of Keller*, 168 S.W.3d at 822.

An appellant may not challenge a trial court's conclusions of law for factual sufficiency, but we may review the legal conclusions drawn from the facts to determine their correctness. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). In an appeal from a bench trial, we review the conclusions of law de novo and will uphold them if the judgment can be sustained on any legal theory supported by the evidence. *Id.* "If the reviewing court determines a conclusion of law is erroneous, but the trial court rendered the proper judgment, the erroneous conclusion of law does not require reversal." *Id.*

### Declaratory Judgment

In her first issue, Batey challenges the trial court's determination that the declaratory relief she sought under the Post-Marital Agreement was not justiciable. In her second issue, Batey argues the trial court erroneously determined that the declaratory relief she sought under the 2002 Agreement was not justiciable.

The Declaratory Judgments Act specifically provides for a party to obtain a declaration on "any question of construction or validity arising under [an] instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder." TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a) (Vernon 2008). A contract "may be construed either before or

after there has been a breach." *Id.* § 37.004(b).  Batey asserts both the Post-Marital Agreement and the 2002 Agreement have been violated.

## A.    The Post-Marital Agreement

In her first issue, Batey challenges the trial court's determination that the declaratory relief she sought under the Post-Marital Agreement was not justiciable. In her petition, Batey sought declarations that  "[t]he Post-Marital Agreement remains valid and enforceable" and "[t]hat paragraph 3 of the Post Marital Agreement still mandates that should Defendant O'Donnell become entitled to any shares of IBSCO above his initial five (5%), then those additional shares may only come from the shares held by Defendant Droluk."

Batey alleged in her petition that Droluk had claimed that the Post-Marital Agreement was unenforceable in early 2007.  Droluk filed a general denial.  At trial, Batey specifically asserted that Droluk disclaimed the enforceability of the provision requiring any additional stock given to O'Donnell to come from Droluk's ownership share.  Batey identified two things as proof that Droluk claimed the Post-Marital Agreement was not enforceable: her own testimony that he had said this in April 2007 and an email from Droluk in January 2007.

The email in question was from Droluk to Batey.  In it, he stated that he had forgotten about the agreement, including the provision limiting the source of O'Donnell's stock.  He said that he could not understand why he would have

11

agreed to those terms. As a result, he asked her to agree "to have [that provision] deleted from the 'Postmarital Agreement,' and allow the terms of [O'Donnell's] Employment Agreement to be applied as regards whatever amount of shares are rightfully due to him."

On cross examination, when asked if he agreed that any additional stock to O'Donnell had to come from Droluk's shares, Droluk responded, "Yes, I do." Droluk then said he had never disagreed with that statement. In its findings of fact, the trial court determined that there was no justiciable controversy between the parties.

"A declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought." *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995) (citing *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). The general test for standing requires that there be a real controversy between the parties that will actually be determined by the judgment sought. *Tex. Ass'n of Bus.*, 852 S.W.2d at 446. If a party lacks standing to bring an action, the trial court lacks subject-matter jurisdiction to hear the case. *Id.* at 444–45. Whether a court has subject-matter jurisdiction is a legal question that is reviewed de novo. *Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 855

(Tex. 2002); (citing *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 928 (Tex. 1998)).

Batey testified that Droluk had claimed the provision of the Post-Marital Agreement concerning the origin of any stock transferred to O'Donnell was not enforceable. Droluk denied ever claiming the provision was unenforceable. The only other evidence Batey relies on to establish her position was an email from Droluk to her in January 2007.

In the email, Droluk (1) acknowledges the provision at issue, although he admits that he had forgotten about it up until that time, and (2) asks Batey to agree to remove it. If anything, this establishes that Droluk recognized its enforceability. It says nothing suggesting that Droluk believed it was unenforceable. The fact that Droluk admitted to forgetting the agreement's terms is not a repudiation of its enforceability.

Batey also argues that, by asserting a general denial of her claims against him, Droluk established that there was a controversy to be resolved by the trial court. When a defendant fails to file an answer to a suit, "the non-answering party in a no-answer default judgment is said to have admitted both the truth of facts set out in the petition and the defendant's liability on any cause of action properly alleged by those facts." *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 183 (Tex. 2012). In contrast, "[a] general denial of matters pleaded

13

by the adverse party which are not required to be denied under oath, shall be sufficient to put the same in issue." TEX. R. CIV. P. 92. That is, a general denial does not force the defendant to claim that every factual assertion by the plaintiff is false. Instead, it puts the claims of the plaintiff "in issue," placing the burden on the plaintiff to establish liability. *See id.*; *Shell Chem. Co. v. Lamb*, 493 S.W.2d 742, 744 (Tex. 1973) (holding "[i]t is well settled that a general denial puts the plaintiff . . . on proof of every fact essential to his case").

At trial, Droluk argued there was no liability because there was no dispute; he had always agreed the provision was enforceable. This is not inconsistent with his general denial. Batey testified that Droluk had claimed the provision was unenforceable. This created a factual dispute between the parties, which the trial court was left to resolve. *See Zenner*, 371 S.W.3d at 314 (holding trial court acts as factfinder in bench trial and is sole judge of credibility of witnesses).

Because there is evidence in the record the trial court could have relied on to determine that the enforceability of the Post Marital Agreement was not in controversy and therefore not justiciable, we hold the evidence is legally sufficient to support the trial court's ruling. We further hold the trial court's ruling is not against the great weight and preponderance of the evidence. We overrule Batey's first issue.

14

**B.     The 2002 Agreement**

In her second issue, Batey argues the trial court erroneously determined that the declaratory relief she sought under the 2002 Agreement was not justiciable. Instead, she argues, she is "entitled to a declaration that Droluk and O'Donnell's attempts to ban her from the premises and limit her interaction with IBSCO's employees and accountant violate the 2002 Agreement." In her petition, Batey sought the following declarations concerning the 2002 Agreement:

> That the email which Defendant O'Donnell sent to all IBSCO employees on March 15, 2007, directing that Plaintiff could have no contact with them and was banned from IBSCO's premises has no force or effect as a corporate act of IBSCO;
>
> That the email which Defendant Droluk sent to Plaintiff on March 13, 2007, directing Plaintiff to stay off of IBSCO property and threatening to remove her from the board of directors has no force or effect as a corporate act of IBSCO; and
>
> Defendant Droluk's March 28, 2007, communication with Ronnie George directing him to have no more communication with Plaintiff has no force and effect as a corporate act of IBSCO.

In March 2007, Droluk emailed Batey claiming she was in violation of the 2002 Agreement. The email identified what Droluk believed were the limits of her involvement with IBSCO and threatened legal action if she did not restrain her actions. O'Donnell sent similar emails concerning Batey to IBSCO employees and agents. Batey sought a declaratory judgment that these emails improperly limited her involvement in IBSCO, in violation of the 2002 Agreement. The trial court

15

rendered a take-nothing judgment against Batey, denying her request for declaratory relief. In its findings of fact and conclusions of law, the trial court concluded that none of Batey's declaratory action claims raised a justiciable controversy.

"A declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought." *Bonham State Bank*, 907 S.W.2d at 467 (citing *Tex. Ass'n of Bus.*, 852 S.W.2d at 446). Droluk's and O'Donnell's emails and the testimony at trial established there was a significant disagreement between the parties in how much responsibility and access to the premises the 2002 Agreement conferred on Batey. This is a controversy between the parties and it can be resolved by a declaration of rights. *See id.* Accordingly, with one exception identified below, it is justiciable.

If a conclusion of law is erroneous but the trial court rendered the proper judgment, however, the erroneous conclusion of law does not require reversal. *BMC Software*, 83 S.W.3d at 794. We must determine, then, whether the trial court's denial of Batey's declaratory action on the 2002 Agreement can otherwise be upheld.

16

In June 2002, Batey, Droluk, and O'Donnell entered into an agreement attempting to resolve the issues that had arisen between Batey and O'Donnell. The agreement stated, in pertinent part,

> It has never been [Batey]'s intent to decrease her daily involvement with IBSCO. She was enthused to be working with a new President, Jack O'Donnell, and looked forward to promoting IBSCO together. Unfortunately, this situation did not work out for either party. [O'Donell] and [Batey]'s difference in day-to-day operational strategies cause continual friction between the two.
> This decision to minimize JoAnn's involvement is being made for the betterment of the company.
>
> Therefore, the parties agree to the following:
> - JoAnn [Batey] will continue to take notes and record in the corporate book the Stockholder minutes and the Board of Directors minutes held annually under the position of Secretary/Treasurer.
> - JoAnn will continue to hold the position of Vice President on the Board of Directors, ensuring her right to vote on company matters.
> - JoAnn will continue to perform ISO Audits as lead auditor for 4.1 Management Review and 4.17 Internal Audits as a minimum.
> - IBSCO will continue to give JoAnn her salary and benefits she was receiving prior to her reduced involvement
> - IBSCO will have the financial advisor . . . review annually if a cost of living increase is applicable.
>
> This agreement will remain in force until such time as JoAnn sells her shares or all three parties involved consent to any change.

In his email, Droluk summarized the terms of the 2002 Agreement. He also asserted that Batey had never performed an audit after the 2002 Agreement and that, accordingly, the provision concerning performing the audits was null and void. Droluk further claimed that Batey had been disruptive in her recent visits to IBSCO. As a result, Droluk told Batey her visits to the company would be limited

17

to the annual meeting of the board of directors. O'Donnell's email to employees and IBSCO's accountant informed them of Batey's restricted access and instructed them to refer Batey to Droluk or O'Donnell if Batey attempted to contact them.

The 2002 Agreement identifies three job responsibilities for Batey. First, she has the task of "tak[ing] notes and record in the corporate book the Stockholder minutes and the Board of Directors minutes held annually under the position of Secretary/Treasurer." This relates directly to her role on the board of directors. Batey does not identify any responsibility related to this task that necessitates access to the premises other than the times identified in Droluk's email.

The second responsibility explains that Batey will "hold the position of Vice President on the Board of Directors, ensuring her right to vote on company matters." Batey relies on section 21.401 of the Texas Business Organizations Code to argue that, for her responsibilities on the board of directors, she is permitted greater access to the company than what Droluk stated in his email. Section 21.401 provides that a board of directors of a corporation shall "direct the management of the business and affairs of the corporation." TEX. BUS. ORGS. CODE ANN. § 21.401(a)(2) (Vernon Supp. 2013). The Business Organizations Code expressly contemplates, however, that certain of its provisions may be limited by a shareholders' agreement, such as the 2002 Agreement, to regulate the role of directors. *See* TEX. BUS. ORGS. CODE ANN. §§ 21.101 (Vernon Supp.

18

2013), 21.401(a). Batey provides no legal authority or citations to the record for how the Business Organizations Code establishes that she, in her capacity as an individual director, has a right or need to greater personal access to the business than Droluk's email states. *See* TEX. R. APP. P. 38.1(i) (requiring briefs to contain appropriate citations to legal authority and to record).

The final responsibility given to Batey in the 2002 Agreement is "perform[ing] ISO Audits as lead auditor for 4.1 Management Review and 4.17 Internal Audits." The record establishes that, after the 2002 Agreement, Batey never did another audit. She testified that when the next time for audits came in 2003, she emailed IBSCO's operations manager, Jamee Reed, to find out when the audits should begin. By that time, however, the relevant regulations had changed and Batey no longer had the necessary qualifications to perform the audits. It was undisputed that IBSCO had other people with the requisite training that could perform the audits.

Batey offered to get the requisite training. What happened after that is in dispute. Batey testified that, when she offered to get the training, Reed informed her that Droluk did not want her on the premises. She then took no further action other than to tell O'Donnell that she "was disappointed that [she] was no longer allowed to do the audits." In contrast, Reed denied that Batey did not do the audits because Droluk did not want her on the premises. Instead, Reed testified that

19

Batey offered to obtain the required training, "but we never took her up on it." Either way, there is no indication in the record that, after 2003, Batey made any further attempt to be involved in the audits or to obtain the necessary training to perform the audits.

The trial court concluded that Batey had failed to present a justiciable issue on this matter, along with others. Batey's argument in her live pleading and on appeal is that the terms of the 2002 Agreement allow her greater access to the company than Droluk's and O'Donnell's emails claim. It is undisputed, however, that Batey had not performed the audit in the ten years before trial.[1] Nothing in her pleadings or argument on appeal establishes that she is trying to assert her right to perform the audit now. Even when Batey testified, she claimed that Droluk and O'Donnell had violated the agreement at the time of the audit in 2003, but nothing in her testimony indicates she expected or even wanted to resume doing the audits as a result of the trial. We agree with the trial court that Batey has failed to present an argument for how she can claim a right to access the premises for an activity she has not performed in over ten years and is not now asserting the right to perform. *See Bonham State Bank*, 907 S.W.2d at 467 (holding declaratory judgment is appropriate only if justiciable controversy exists as to the rights and status of the parties).

---

[1] The record establishes that she performed her last audit in 2002. Batey filed suit five years later and went to trial on the declaratory judgment action ten years later.

20

Batey also points out that she engaged in activity not covered by the 2002 Agreement between 2002 and 2007. She argues that, "by failing to protest Batey's periodic appearances at IBSCO over the course of the preceding five years, Droluk and O'Donnell waived their current argument that the 2002 Agreement gave them a contractual right to ban Batey from the premises." For authority, Batey cites *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) for the proposition that waiver is "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right."

Batey is arguing more than just waiver, however. Batey is arguing that, whenever any director, officer, or employee of a company engages in any activity other than what is specifically enumerated as a job duty, those additional activities become permanent and irrevocable rights. *Jernigan*—a case concerning the timeliness of an expert report in a medical malpractice case—does not support this argument. *See* TEX. R. APP. P. 38.1(i) (requiring briefs to contain appropriate citations to legal authority and to record).

Finally, Batey argues she is a vice president of IBSCO and, as such, is charged with the duty to run the company in the president's absence. She argues this duty is imposed by subsection 1.002(88) of the Texas Business Organizations Code. *See* TEX. BUS. ORGS. CODE ANN. § 1.002(88) (Vernon Supp. 2013). Subsection 1.002(88) provides:

21

In this code . . . "Vice president" means the:

(A) individual designated as vice president of an entity under the governing documents of the entity; or

(B) officer or committee of persons authorized to perform the functions of the president of the entity on the death, absence, or resignation of the president or on the inability of the president to perform the functions of office without regard to the designated name of the officer or committee.

*Id.*

Section 1.002(88) defines the meaning of "vice president" as that phrase is used in the Texas Business Organizations Code. It does not define the duties of all persons with the title "vice president" in all business entities.

Instead, an officer's duties are defined by "the governing documents of the entity or the governing authority that elects or appoints the officer." TEX. BUS. ORGS. CODE ANN. § 3.103(b) (Vernon 2012). IBSCO's bylaws provide that its board of directors has the authority to appoint IBSCO's officers. While the bylaws identify certain categories of officers and their automatically assigned duties and responsibilities, the bylaws also provide that the board of directors can modify those.

Batey's position referenced in the 2002 Agreement, "Vice President on the Board of Directors," is not listed in the bylaws. The agreement explains that this position functions to "ensur[e] her right to vote on company matters." Voting on company matters is a typical function of a board of directors. Accordingly, this

position ensures her role as a director of IBSCO. The trial court could reasonably have found that Batey's title did not, in itself, create any additional implied responsibilities requiring greater access to the premises than what Droluk's email states.

We hold any error in the trial court's judgment concerning Batey's declaratory action on the 2002 Agreement is not reversible. *See BMC Software*, 83 S.W.3d at 794. We overrule Batey's second issue.

**Breach of Fiduciary Duty**

In her third issue, Batey argues the trial court abused its discretion by determining that Droluk and O'Donnell did not breach any fiduciary duties owed to IBSCO and that Droluk did not personally owe Batey any fiduciary duties. Batey argues Droluk and O'Donnell breached their fiduciary duties to IBSCO and to her in three ways: (1) paying for expenses not incurred by IBSCO, (2) mismanagement of IBSCO's inventory, and (3) failing to provide her with a copy of DRDA's financial performance review. The trial court found no duties to IBSCO were breached. Batey contends this finding is against the great weight and preponderance of evidence.

Batey asserted breach of fiduciary duty claims against IBSCO in her individual capacity and in a shareholder derivative suit. Generally, "to recover for wrongs done to the corporation, the shareholder must bring the suit derivatively in

23

the name of the corporation so that each shareholder will be made whole if the corporation obtains compensation from the wrongdoer." *Redmon v. Griffith,* 202 S.W.3d 225, 233 (Tex. App.—Tyler 2006, pet. denied) (citing *Faour v. Faour,* 789 S.W.2d 620, 622 (Tex. App.—Texarkana 1990, writ denied)). In a closely held corporation, however, "a derivative proceeding brought by a shareholder of a closely held corporation may be treated by a court as a direct action brought by the shareholder for the shareholder's own benefit." TEX. BUS. ORGS. CODE ANN. § 21.563(c)(1) (Vernon 2012). Batey does not draw any distinction between the breach of fiduciary duty claims she asserts derivatively and the ones she asserts individually. Accordingly, we will analyze them together.

### A. Expenses not Incurred by IBSCO

Batey alleges Droluk breached the fiduciary duties owed to IBSCO and to her when he arranged for IBSCO to pay the salary for Mike Peng, allegedly used his IBSCO American Express card for personal expenses, and charged IBSCO for his moving expenses from China to Houston. Batey argues the record establishes that Droluk breached fiduciary duties owed to IBSCO and to her.

Droluk had IBSCO pay a total of $16,000 to a Chinese citizen, Mike Peng. The trial court found that Droluk hired Peng to represent IBSCO's interests in China. The trial court also found that Droluk's decision to hire Peng did not breach any fiduciary duty owed to IBSCO. Batey alleges Mike Peng was a Blue

24

Line employee who received a salary from IBSCO. Batey argues that there is insufficient evidence to support the trial court's determination that Peng was a consultant hired for IBSCO's benefit because there is no paperwork reflecting how Peng's work benefited IBSCO.

The record establishes that IBSCO's board of directors discussed hiring a corporate representative in China. Droluk testified that Peng was an independent contractor at the time he was hired and that IBSCO only paid him for work done on its behalf. O'Donnell agreed that Peng was paid by IBSCO for work done for IBSCO.

Against this, Batey argues she met her burden at trial by establishing that there was no documentary support to show that the work Peng did was for IBSCO. Batey does not establish that documentary support was necessary, however. Droluk testified that Peng provided no paperwork documenting his activities because, in China, that is not the usual business practice. While the trial court could have considered the lack of paperwork in its credibility determination, that is a determination we cannot disturb. *See Zenner*, 371 S.W.3d at 314 (holding trial court, as factfinder in bench trial, is sole judge of credibility of witnesses). We hold there is sufficient evidence in the record to support the trial court's ruling.

Batey also alleges Droluk breached the fiduciary duties owed to IBSCO by using an IBSCO credit card to pay for personal expenses. As evidence, Batey

offered a list of dining and travel charges taken from Droluk's company American Express statement that she believes were not business related. In court she admitted some items on her list were likely legitimate business expenses, but she could not identify those items specifically. She also admitted she was unaware of whether Droluk reimbursed IBSCO for any personal expenses charged to the company card. Given these ambiguities, we hold the trial court could have reasonably found that Batey failed to sufficiently establish that Droluk had breached any fiduciary duty on the basis of the credit card purchases.

Similarly, Batey testified that she did not believe IBSCO should have paid $10,000 towards Droluk's moving back to the United States from China. The evidence at trial, however, established that Droluk did work for IBSCO, including performing his role as CEO, while in China. He continued to work for IBSCO upon his return. Batey provides no argument for why the evidence could not support a determination that Droluk's move back to the United States was a business expense. We hold the evidence is sufficient to support a determination that Droluk did not breach any fiduciary duties to IBSCO or to her in paying for the identified expenses.

## B. Inventory and Financial Performance Review

Batey also alleges that Droluk and O'Donnell breached their fiduciary duties to IBSCO and to her by mismanagement of the inventory and failing to present the

26

financial performance review to her. Batey argues that Droluk and O'Donnell breached their duties of due care, loyalty, and obedience. For authority that Droluk and O'Donnell bore these duties, Batey relies on *Floyd v. Hefner*, 556 F. Supp. 2d 617, 633–34 (S.D. Tex. 2008). *Floyd*, in turn, relies on *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707 (5th Cir. 1984). In *Gearhart*, the Fifth Circuit held that, in Texas, "[t]hree broad duties stem from the fiduciary status of corporate directors; namely, the duties of obedience, loyalty, and due care." *Id.* at 719.

Under *Gearhart*, "[t]he duty of obedience requires a director to avoid committing ultra vires acts, i.e., acts beyond the scope of the powers of a corporation as defined by its charter or the laws of the state of incorporation." *Id.* Batey has provided no explanation, at trial or on appeal, for how any alleged mismanagement of the inventory or how failure to provide her a copy of the financial performance review were acts beyond the scope of the powers of IBSCO. *See id.* Accordingly, we find no basis for its application.

The duty of loyalty, *Gearhart* explains, concerns a director's personal usurping a corporate opportunity or transacting with the company. *Id.* at 719–20. Batey has not identified any business opportunity that Droluk or O'Donnell has usurped. Nor do her complaints concern a transaction between Droluk or O'Donnell, individually, and IBSCO. The duty of loyalty, then, is likewise inapplicable.

For the duty of due care, *Gearhart* holds "a director must handle his corporate duties with such care as 'an ordinarily prudent man would use under similar circumstances.'" *Id.* at 720 (quoting *McCollum v. Dollar*, 213 S.W. 259, 261 (Tex. Comm'n App. 1919, holding approved)). Under this analysis, a decision of a director is not a breach of the fiduciary duty unless it is tainted by fraud, known commonly as the business judgment rule. *Id.* at 721.

The appropriate amount of inventory to be held by IBSCO was frequently discussed and disputed between Batey, Droluk, and O'Donnell. Droluk testified that Batey raised concerns about IBSCO's growing inventory at almost every board of directors' meeting.

In 2005, Batey, Droluk, and O'Donnell discussed selling the company. They agreed that, if the company was valued around $7.5 million, they would hire a broker to sell the company. If the company was valued for less than that, they would seek advice on how to increase the value of the company.

Batey, Droluk, and O'Donnell hired DRDA to value the company. DRDA ultimately valued the company between $3 and $5 million. They then asked DRDA to recommend ways to increase the value of the company. DRDA produced the financial performance review in response. In the financial performance review, DRDA recommended reducing $1.5 million worth of high-

cost, slow-moving inventory. DRDA estimated that doing so would result in saving $300,000 per year.

In their dealings with DRDA as it prepared the financial performance review, Droluk and O'Donnell believed that DRDA did not understand IBSCO's business structure. Ultimately, Droluk and O'Donnell disagreed with DRDA's recommendation to reduce inventory. O'Donnell testified that DRDA was recommending disposing of "the high-priced items we were going to use to grow our business." Because Droluk and O'Donnell believed that DRDA did not understand IBSCO's business structure, they terminated DRDA's services without implementing its recommendations. They did not present the financial performance review to Batey for review or for a vote on whether the recommendations should be implemented.

None of these facts establish as a matter of law or by the great weight of the evidence the existence of a decision tainted by fraud. Droluk and O'Donnell explained their reasons for why they did not implement DRDA's recommendations to reduce inventory. Batey has not shown why the trial court was required to conclude that the failure to reduce inventory was in any way tainted by fraud. The trial court did determine that Droluk and O'Donnell breached the 2002 Agreement with Batey by not presenting the financial performance review to her and allowing a formal vote on the matter. But proof of breach of contract does not, in itself,

establish as a matter of law a breach of fiduciary duty. We hold the evidence is legally and factually sufficient to support the trial court's judgment.

We overrule Batey's third issue.

## Shareholder Oppression

In her fourth issue, Batey challenges the trial court's determination that there was no shareholder oppression.

There are two non-exclusive definitions of shareholder oppression:

1. majority shareholders' conduct that substantially defeats the minority's expectations that, objectively viewed, were both reasonable under the circumstances and central to the minority shareholder's decision to join the venture; or

2. burdensome, harsh, or wrongful conduct; a lack of probity and fair dealing in the company's affairs to the prejudice of some members; or a visible departure from the standards of fair dealing and a violation of fair play on which each shareholder is entitled to rely.

*Boehringer v. Konkel*, 404 S.W.3d 18, 25 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

Determining whether shareholder oppression exists involves "balancing the minority shareholder's reasonable expectations against the corporation's need to exercise its business judgment and run its business efficiently." *Id.* (citing *Ritchie v. Rupe*, 339 S.W.3d 275, 289 (Tex. App.—Dallas 2011, pet. granted)). Shareholder oppression is more often found in closely-held corporations than in

larger businesses.  *See Davis v. Sheerin*, 754 S.W.2d 375, 381 (Tex. App.—Houston [1st Dist.] 1988, writ denied).

In determining whether shareholder oppression exists, the factfinder determines whether certain acts occurred. *Ritchie*, 339 S.W.3d at 289.  The trial court then determines, as a matter of law, whether those facts constitute shareholder oppression toward a minority shareholder. *Boehringer*, 404 S.W.3d at 26; *Davis*, 754 S.W.2d at 380.  A claim of oppressive conduct can be independently supported by evidence of a variety of conduct.  *Davis*, 754 S.W.2d at 381. Oppressive conduct is an independent ground for relief that does not require a showing of fraud, illegality, mismanagement, wasting of assets, or deadlock. *Id.* at 381–82.

Batey alleges shareholder oppression under both definitions.  Under the "burdensome, harsh, or wrongful conduct" definition, Batey argues (1) she was locked out of the building, (2) her access to the premises was limited, and (3) employees were told to limit their interactions with Batey.  For the allegation that she was locked out of the building, the trial court could have credited Droluk's testimony that the change of locks was to prevent employee theft, and that Batey received a new key after she requested one.  We have already held there is legally and factually sufficient evidence to support the determination that Batey did not have a legal basis to demand unlimited access to the premises.  Nothing in the

31

record suggests that the limitations placed on Batey's access to the premises and employees has impaired her ability to perform her current functions established in the 2002 Agreement or her ability to vote on matters discussed in meetings by the board of directors. We hold the evidence is legally and factually sufficient to support the determination of no shareholder oppression under the "burdensome, harsh, or wrongful conduct" definition.

When determining whether a minority shareholder's reasonable expectations were substantially defeated under the first definition of shareholder oppression, we distinguish between specific reasonable expectations and general reasonable expectations. *See Boehringer*, 404 S.W.3d at 26. Specific expectations will require proof of specific facts giving rise to the expectations in a particular case and a showing that the expectation was reasonable under the circumstances of the case as well as central to the minority shareholder's decision to join the venture. *Id.* Examples of specific reasonable expectations are employment in the corporation or a role in management. *Id.*

General reasonable expectations are expectations that arise from the mere status of being a shareholder. *Id.* These expectations belong to all shareholders and, absent evidence to the contrary, are both reasonable and central to the decision to invest in the corporation. *Id.* Examples of general reasonable expectations are the right to proportionate participation in the earnings of the company, the right to

any stock appreciation, the right, with proper purpose, to inspect corporate records, and the right to vote if the stock has voting rights. *Id.*

Batey refers to a number of actions taken by Droluk and O'Donnell as proof that her reasonable expectations were substantially defeated. Only one of these complained-of actions were found to be improper by the trial court—failing to present the financial performance review to her and allowing a formal vote on the matter. Other claims of substantially defeating reasonable expectations include changing the locks on the premises, limiting her access to the premises, telling company employees in an email that Batey's involvement would be limited to the annual meeting of the board of directors, and preventing her access to the company's outside accountant.

We have already determined that the trial court could have credited Droluk's testimony that the change of locks was to prevent employee theft, and that Batey received a new key after she requested one. For the complaints that Batey and Droluk limited her access to the premises, told company employees in an email that Batey's involvement would be limited to the annual meeting of the board of directors, and prevented her access to the company's outside accountant, Batey does not provide any further argument or legal support for how these actions were improper. *See id.* (holding specific expectations require proof of specific facts giving rise to expectations and showing that expectations were reasonable); TEX.

R. App. P. 38.1(i) (requiring briefs to contain appropriate citations to legal authority and to record). To the extent Batey is relying on her other arguments in her brief to show improper actions by Droluk and O'Donnell, because we have not found any reversible error in Batey's other issues, we find no error here.

We are left, then, with the trial court's determination that Droluk and O'Donnell improperly failed to present the financial performance review to Batey and allowing a formal vote on the matter. Batey argues that her circumstance is like the situation in *Boehringer*. We disagree.

In *Boehringer*, Konkel owned 49.9% of a closely held corporation and Boehringer held 50.1%. 404 S.W.3d at 22. Boehringer was the president of the company, and Konkel was vice president. *Id.* Some years into the company's operation, the relationship between Boehringer and Konkel grew strained. *Id.* at 23. In a span of eight years, Konkel made 10 to 20 requests for corporate records. *Id.* Boehringer only responded to one of these requests with a one-page spreadsheet. *Id.* At one shareholder meeting, Boehringer voted his majority share to have his wife replace Konkel as vice president, to make the corporation's Subchapter S status revocable on his sole determination, and to place restrictions on resale of stock. *Id.* Subsequently, Boehringer completely locked Konkel out of the company's office and software development computer. *Id.* Konkel later learned that Boehringer had unilaterally quadrupled his salary while reducing

34

Konkel's. *Id.* Based on these and other facts, this Court upheld the judgment against Boehringer for shareholder oppression. *Id.* at 25–33.

In contrast, the trial court in this case found one instance of Batey's being denied the right to vote on a matter that had been discussed and voted on repeatedly by the shareholders. While the review itself may not have been discussed, the board frequently voted on reducing inventory holdings. The record indicates that Batey repeatedly voted to reduce inventory holdings at board meetings. It is possible that being denied the opportunity to vote on a single matter could rise, in certain circumstances, to the level of shareholder oppression based on the expectation to vote on important company matters. But the trial court in this case determined that the single act did not rise to the level of shareholder oppression. Batey has failed to establish that there is no evidence to support this determination or that it is against the great weight of the evidence.

We overrule Batey's fourth issue.

## Conclusion

We affirm the judgment of the trial court.


Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Massengale.

35